## King v. City of Harrisburg et al.

*Carl B. Shelley* and *William S. Middleton,* for plaintiff.

*John R. Geyer* and *Paul G. Smith,* for defendants.

WICKERSHAM, J., Chancellor, Jan. 14, 1929.—This case came on to be heard on a motion for a preliminary injunction. After hearing the evidence, we

filed an opinion refusing to award a preliminary injuction, whereupon an appeal was taken to the Supreme Court. Thereafter it was agreed by counsel that the appeal should be dismissed and that the action should proceed to final hearing, and, upon consideration of this stipulation of counsel, the appeal was dismissed by the Supreme Court and the record remitted to this court for final action.

The case then proceeded to final hearing. After the testimony was taken, it was argued at great length by counsel for the plaintiff and by the City Solicitor. 'Requests for findings of fact and conclusions of law were presented to the chancellor, which we have answered and directed to be filed.

After careful consideration, we present the following

*Findings of fact.*

1. Horace B. King, the plaintiff, is a resident and taxpayer of the City of Harrisburg, County of Dauphin and State of Pennsylvania.

2. Prior to Dec. 8, 1919, the McKee Graham estate owned approximately 100 acres of undeveloped land lying in the City of Harrisburg north of Division Street and between Front and Sixth Streets.

3. Prior to 1875, certain highways had been regularly plotted on the official plan of the City of Harrisburg over and upon this tract pursuant to the Act of Jan. 2, 1871, P. L. 1556, ratifying and confirming the streets laid out within the city and one mile northwardly thereof by virtue of the authority conferred by the Act of April 9, 1869, P. L. 771.

4. The public highways thus plotted on the City Official Plan over and upon the McKee Graham tract prior to 1875 were as follows: Juniata Street, running from the intersection of Front and Division Streets northeastwardly in a diagonal line, and also certain streets, to wit, Second Street, Green Street, Third Street, Fourth Street, Fifth Street and Sixth Street, projecting northwardly into said tract. At the western end of said tract the streets last mentioned were plotted about one-fifth of the distance northwardly across the said tract, and at Sixth Street about four-fifths of the distance northwardly across the said tract, because that line marked the limit of one mile from the city limits. On this same plan, Hoffman Street, or New Sixth Street, as it was known, was laid out at approximately the same location as the Hoffman Street now in controversy, the only difference being that at the northern end the old Hoffman Street was only about 100 feet west of the Sixth Street road, while on the present plans new Hoffman Street is swung westwardly at the northern end 100 feet further. In addition, across the southeastern corner of the McKee Graham tract, prior to 1875, there was located on the City Official Plan a street known as Shamokin Street.

5. North of the McKee Graham tract there were certain tracts of land plotted by others, with dedicated streets which did not fit in with the streets projected into the McKee Graham tract on the City Official Plan.

6. The executors and trustees of the McKee Graham estate were opposed to the opening of the streets as shown prior to 1919 on the City Official Plan and plotted over and upon its tract.

7. During 1918 and 1919, conferences were had between the City Planning Commission and the representatives of the McKee Graham estate, looking towards the realignment and readjustment of the public streets thus plotted over and upon the said tract on the City Official Plan. These conferences were finally consummated in an agreement between the City and the McKee Graham estate, approved by the Planning Commission on Oct. 16, 1919, by which the city obligated itself to strike from the City Official Plan certain

streets as thereon plotted over the McKee Graham tract and to locate therein certain other streets in lieu thereof, including the relocation of Third Street and Sixth Street (now Hoffman Street). As consideration for this agreement, the McKee Graham estate agreed to deed the tract now known as Italian Park to the city, and, further, to release all damages for the opening of the streets which the city thus agreed to place on the official plan, which agreement was approved by the city and an official plan thereof was prepared by the city engineer.

8. While these negotiations between the McKee Graham estate and the Planning Commission were in progress, the Planning Commission suggested to the Board of School Directors of the School District of the City of Harrisburg, in letter dated July 1, 1919, that the site between Third Street and Sixth Street (Hoffman Street), as relocated, would be an ideal location for a senior high school building. Thereupon the agreement was finally reached between the McKee Graham estate, the said school district and the city that the school district should buy this plot; that the city should vacate or strike off the streets plotted over and upon the said tract; that the new layout, including new Hoffman Street, would be put on the City Official Plan, and that when the city came to open these streets, they should be opened without any claim being made for damages for any land taken. The price agreed upon for the land which the said school district desired to purchase was $2250 per acre.

9. Thereafter, on July 7, 1919, the said school district passed a resolution directing the purchase of the land described in the preceding finding of fact.

10. After the resolution of July 7, 1919, was passed, the Planning Commission suggested to the school district the desirability of purchasing the triangular plot between the old Sixth Street road and the new Hoffman Street on the west, in order to prevent it from falling into the hands of undesirable neighbors. And, after some negotiations, the Planning Commission secured an agreement on the part of the McKee Graham estate that it would sell this triangle to the said school district at the same rate per acre as the larger tract west of Hoffman Street.

11. Thereafter, on Dec. 5, 1929, the said school district passed the following resolution:

"That the officers of the board be and are hereby authorized to negotiate and purchase the Nettie McKee Graham plot at Sixth and Division Streets, taking in all the ground from the western line of the proposed Third Street and extending to the western line of the present Sixth Street, and between the northern and southern boundary lines of the Nettie McKee Graham tract, with the understanding that the ground to be included in the proposed new Third and Sixth Streets would be donated to the School District, with the further understanding that the School District donate this land to the City if the proposed new Third Street and the proposed Sixth Street are opened and maintained by the city. The purchase price is to be $2250.00 per acre."

12. Pursuant to the resolution of Dec. 5, 1919, an agreement was entered into between the executors and trustees of the McKee Graham estate and the said school district for the purchase of the tract of land as described in the preceding finding of fact.

13. The survey contemplated by and made a part of the agreement of Dec. 5, 1919, was made by E. W. Cowden, civil engineer, acting for the said school district. This survey showed the total area of the tract to be 46.63 acres, from which was deducted the area included in the proposed new Third

Street and new Sixth Street (Hoffman Street), amounting to 4.82 acres, leaving a balance upon which the total consideration was computed of 41.81 acres.

14. On Dec. 15, 1919, a deed was executed by the executors and trustees of the McKee Graham estate for the tract of land as described in the agreement of Dec. 5, 1919, for the consideration of $94,072.50. The tract conveyed included the land covered by the proposed new Third Street and the proposed new Sixth Street (Hoffman Street), but for said land no charge was made.

15. The said deed of Dec. 15, 1919, included the following paragraph:

"The parties hereto agree that when the City of Harrisburg shall open Sixth Street eighty feet wide between Division Street and Katherine Street in the Ninninger Plan, and Third Street sixty feet wide, extending from Third Street on the Feldheim Plan to the intersection of Third and Division Streets, as approved by the City Planning Commission of Harrisburg, neither of said parties will make any claim for damages resulting from the opening of the above mentioned streets as aforesaid."

There is a similar paragraph in the agreement of Dec. 5, 1919.

16. In accordance with the understanding between the McKee Graham estate, the city and the said school district, the city, by proper official action, carried out its undertakings, and the older plotted streets were stricken from the City Official Plan and the location of the streets as agreed upon, including Third Street and Hoffman Street, were plotted thereon in accordance with the agreement. And Hoffman Street was further plotted northwardly as an eighty-foot street or thoroughfare through and beyond the city limits to the Linglestown Road. Since that time property owners on this thoroughfare northwardly have adjusted their improvements and properties to the line of the new eighty-foot street.

17. Also, in accordance with the said understanding and agreement, the city beautified Italian Park on the west side of Third Street as relocated, and opposite the property of the school district, and opened, graded and paved said Third Street as relocated, between Division Street and Graham Street, at the instance and with the approval of the said school district, which made no claim for damages therefor.

18. Further, pursuant to said understanding between the parties, on Nov. 18, 1919, an ordinance was duly passed by city council and signed by the mayor, authorizing and directing the city engineer to make a topographical survey of that portion of the City of Harrisburg known as the 14th Ward.

19. By communications dated Dec. 15, 1919, addressed to city council, the city engineer, as required by the Ordinance of Nov. 18, 1919, submitted to city council a topographical survey of the 14th Ward, together with map showing the existing and proposed highways within the limits of the school district tract and the streets proposed to be vacated—all in accordance with the said agreement. And the plan thus submitted, with minor changes not affecting the school district, was finally adopted by city council on April 21, 1921.

20. The said school district acquired the tract in question with full knowledge, consent and agreement that, in consideration of certain streets being stricken from the City Official Plan, Third Street and Hoffman Street, both as relocated, were dedicated as public streets and might be opened by the city without any claim for damages therefor.

21. The school district purchased said tract; its deed was prepared and its buildings were erected over a plan or survey which assumed that the agree-

ment between the McKee Graham estate and the city had been fully carried out.

22. The proposed opening and grading of Hoffman Street will not render useless for school purposes any portion of the school district property east of Hoffman Street.

23. The use of the lands for Hoffman Street at the point in question may reasonably exist, together with the use of the adjoining lands for public school purposes. Such use aids in the accessibility of the school site to the general public and permits the orderly growth and development of the city, and was in the contemplation of both the city and the school district at the time the lands were acquired for school purposes.

24. The opening and grading of said Hoffman Street is necessary for the growth and development of the city to the north.

## Discussion.

Much of the brief of counsel for the plaintiff is devoted to the question, was there a dedication of Hoffman Street for public use? This contention was brought to our attention and was argued when we had under consideration the rule to show cause why a preliminary injunction should not be granted restraining the City of Harrisburg from opening and grading Hoffman Street. At that time, we wrote an opinion discharging the rule to show cause and refusing the preliminary injunction, in which this question was considered and discussed—see page 5, *et seq.*, of our opinion, reported in 32 Dauphin Co. Reps. 19-24. After defining "dedication" and citing many authorities, we reached the following conclusion: "We think the intent of the executors and trustees of the Graham estate to dedicate the land included within the lines of new Third Street and new Sixth Street, now Hoffman Street, in consideration that the City of Harrisburg would vacate streets theretofore projected into this tract of land, clearly appears by the evidence:" 32 Dauphin Co. Reps. 25.

What we said in that opinion need not be repeated here.

This case proceeded to final hearing and was argued at length. After carefully considering the matter, we are of the opinion that nothing has been shown which moves us to alter the opinion we heretofore expressed, and we affirm what was said in our former opinion.

We might rest our opinion without further discussion; however, at the oral argument it was contended by counsel for the plaintiff that, assuming there was no dedication of the land over which the city now proposes to open Hoffman Street, formerly called new Sixth Street, the city has no authority under its power of eminent domain to lay out a street on the land owned by the school district, for the reason that land held for one public use cannot be condemned for another public use. In order that this case may be reviewed by the court *in banc*, and, if an appeal is taken, by the Supreme or Superior Courts, we have given this subject very careful attention.

Is the contention that land held for one public use cannot be condemned for another public use sound? and does this contention apply to the facts in this case as we have found them to be?

Counsel for plaintiff places much reliance in the case of St. Louis *v.* Moore, 269 Mo. 430; 190 S. W. Repr. 867. We think this case is not controlling. We are impressed by the ruling of the Massachusetts Supreme Judicial Court in Easthampton *v.* Hampshire County Comm'rs, 154 Mass. 424. The question before that court in that case was whether county commissioners can take a strip of land from a school-house lot for a town way. Mr. Justice Holmes,

then a member of that court, writing the opinion of the court, held: ". . . Taking the strip will injure the lot considerably for school purposes, but will not prevent its use, so far as appears. We must assume that the way is necessary, and, if it be material, we must assume that taking this strip is reasonably necessary for the way, whoever may be the final judge on the latter question when it is raised. . . ."

The learned Justice, on page 425, proceeds to state the law as follows: "We must consider the relative importance and the necessities of the two uses generically, the extent of the harm to be done, accept any light that history may throw, and make up our minds, under all the circumstances of the particular case, as best as we can. To put cases nearer to the present, and lying between the two extremes which we have mentioned, it would be a strong thing to say that, without special circumstances, county commissioners or other like officers, acting under general powers, could lay out a highway through a public reservoir so as to ruin it (citing cases). On the other hand, if a tract of land were held for public purposes, which was so broad that it was impracticable to go round it, and which could be crossed without serious harm by the edge of a stream that flowed through it, it well might be held lawful for the way to cross it. . . . It is impossible to accept any unqualified rule that no part of such land can be taken for a way under any circumstances without an express enactment. In the only case which we have found precisely parallel to this, it was held that the strip was lawfully taken from the school lot: Rominger v. Simmons, 88 Ind. 453."

This case is also reported in 13 L. R. A. 157. See, also, City of Boston v. Inhabitants of Brookline, 156 Mass. 172; also opinion of Lowell, District Judge, in Re Certain Land in Lawrence, 119 Fed. Repr. 454; United States v. Gettysburg Electric Ry. Co., 160 U. S. 668.

The rule is succinctly stated in 2 Lewis on Eminent Domain (3rd ed.), § 435, page 785, as follows: "Lands and buildings in actual use for public schools cannot be taken for other public uses under a general authority. But this rule will not protect schools of any and every size. It has been held that a strip of land may be taken from a school lot which might impair, but did not prevent, its continued use for school purposes," citing Easthampton v. County Commissioners, supra; also reported in 28 N. E. Repr. 298.

The law is broadly stated in 20 Corpus Juris, § 91, page 605, as follows: "In the absence of some statutory provision expressly or by implication forbidding it, property devoted to one public use may under general statutory authority be taken for another public use, where the taking will not materially impair or interfere with or is not inconsistent with the use already existing, and is not detrimental to the public. It is not material that some inconvenience may result to the prior occupant, if the conditions are such that the two uses can stand together. The rule that power must be conferred expressly or by necessary implication applies only where the second use will destroy or injure the use to which the land was originally appropriated," citing Independent Natural Gas Co. v. Butler Water Co., 210 Pa. 177; Philadelphia, etc., R. R. Co. v. Philadelphia, 9 Phila. 563.

In Com. ex rel. v. George, 148 Pa. 463, it was held: "It is one of the inherent powers of a city to pave, grade, sewer and otherwise improve its streets, and to pay therefor, and this power exists without any express legislative grant, and unless it has been taken away by some legislation." See, also, Pennsylvania Hospital v. City of Philadelphia, 254 Pa. 393.

Applying the above authorities to the facts, we find that laying out Hoffman Street across the eastern end of the property of the school district is

necessary in order to eliminate two dangerous curves, one at the corner of Division and Sixth Streets, and the other at the corner of Sixth and Graham Streets. We find also that the two public uses may stand together, and while the opening and use of Hoffman Street as it is now intended to be opened and used will result in some inconvenience to the property of the school district, it will not destroy its use. The opening of this street will require the removal of about sixty-three trees; some are good and some are bad.

There also was testimony that the opening and use of this street would result in great danger to the school children. The evidence shows, however, that the street will be quite some distance from the school building. Doctor Fager, Principal of the William Penn High School, testified with regard to the *locos in quo* (Notes of testimony, page 3): "Well, at the lower part it is uneven; I would say [for] the lower two-thirds it is uneven, with trees—at one place where there was a swamp there is a depression there, back of the school. Now, to the north, the temporary road that was there during the time the school was building, to the north of that it is level and is covered with trees; I don't know of anything else."

Inquiry being made of Doctor Fager as to the condition of these trees, he replied: "Well, some are good and some are bad; that is my opinion." (Notes of testimony, page 3.)

Doctor Fager also testified that during intermission the scholars of William Penn High School circulate over the ground through which Hoffman Street will pass; at one time a pageant was held there. The doctor further testified (Notes of testimony, page 4): "The only level part of the campus back of the building is to interfere with this temporary road that I have spoken of before. That is the best part of the campus for anything. South of that it is very uneven. Now, if they would run this road through there, it would bring the road very close to, and I think the sidewalk would cut into some of this playing field that the girls use now."

In answer to the question: "Q. Could this playing field still be utilized if the proposed street goes through? Doctor Fager replied: A. Yes; it will restrict it." (Notes of testimony, page 4.)

On cross-examination, Doctor Fager testified that the nearest point of the proposed Hoffman Street to the football ground on the campus would be 200 feet, and that the distance to the school building would be more than 200 feet.

The principal danger in the minds of witnesses for the plaintiff was that the girls playing hockey might drive their balls into the proposed street, and running after the balls might subject them to danger. We think a wire fence or protection could at small expense be placed along the hockey field so that the balls would not fly or roll into the street when opened, and that would eliminate this element of danger.

We are of the opinion, therefore, that the power of the city to condemn this land for public use is clearly established by the weight of the authorities; that it may subject the school district to some inconvenience, but does not destroy the property for the purpose for which it is used, and that the danger to the scholars playing hockey may easily and inexpensively be eliminated.

We agree, however, with the suggestion of the learned City Solicitor that it is not necessary to determine this question in these proceedings because of the facts. It clearly appears that the school district purchased, its deed was prepared, and its buildings erected over a plan or survey which assumed that the agreement between the Graham estate and the city had been fully carried out; in fact, a survey showing Hoffman and Third Streets as plotted on the

ground and certain other streets as stricken off was specifically attached as part of the agreement of sale between the Graham estate and the school district—to all of which we directed attention in our opinion filed and heretofore referred to refusing to grant a preliminary injunction.

After carefully reading and re-reading the testimony taken in this case, we are of the opinion that the facts which we have found are overwhelmingly supported by the weight of the evidence. We think, therefore, the bill of the plaintiff must be dismissed.

We submit herewith the following

### Conclusions of law.

1. The councilmanic body is the sole judge as to the necessity and expediency of the exercise of the power granted to a municipality to open and grade a public highway, and its decision is not reviewed by the court.

2. So long as a street is to be opened to the use of the public, no inquiry will be made by the court into the municipality's purpose in opening it.

3. A dedication consists in the appropriation or gift by the owner of land or an easement thereon for the use of the public.

4. A dedication may be either expressed or implied. The intent to dedicate may be manifested by acts in pais or by conveyance of record. No particular form or ceremony is necessary, and it may be accomplished with or without writing or conveyance. It is only necessary that the intent be expressed by open acts and visible conduct.

5. The sale of land according to a plan which shows it to be on a street implies the grant or conveyance to the purchaser that the street shall be forever open to the public and operates as a dedication to public use.

6. The school district took title to the lot in question subject to a plan approved by the City Planning Commission, establishing the lines of Hoffman Street, which was at some time to be opened by the city, and for which, when opened, no damages could be claimed.

7. The agreement of the school district to purchase the tract in question and the titles taken by it were under and subject to an easement within the lines of said Hoffman Street as now proposed to be opened for highway purposes, and under and subject to the right of city council to open said Hoffman Street at any time without payment of any damages therefor.

8. The executors and trustees of the McKee Graham estate dedicated the land lying within the lines of Third Street and Hoffman Street as relocated on the City Official Plan.

9. The city by appropriate municipal action accepted said Hoffman Street as dedicated, and has fully carried out its part of the agreement made by it with the McKee Graham estate, with the exception of the opening of Hoffman Street, which it now proposes to do.

10. When the school district made its agreement to purchase and took title to the tract in question, it acquired the fee to the land subject to the prior public easement theretofore superimposed with its full knowledge, consent and approval for public highway purposes.

11. When the school district first entered into the agreement to purchase the tract in question, the land lying within the lines of Hoffman Street, as relocated, had already been impressed with a public use for street purposes.

12. In addition to the powers specifically vested in the city by the acts of assembly, it possesses the inherent right of the sovereign to open such streets and thoroughfares and across and through such property as in its discretion are deemed necessary and convenient.

13. The City of Harrisburg has the legal right to open Hoffman Street in question.

14. The injunction as prayed for should be refused.

15. The bill should be dismissed, at the cost of the plaintiff

*Decree nisi.*

The bill of the plaintiff is dismissed, the plaintiff to pay the costs.

Fdom Homer L. Kreider, Harrisburg, Pa.