BOROUGH OF COLUMBIA; Shawnee Run Greenway, Inc., Petitioners,

v.

SURFACE TRANSPORTATION BOARD; United States of America, Respondents,

Frank Sahd Salvage, Intervenor Respondent.

No. 02–2599.

United States Court of Appeals, Third Circuit.

Argued April 10, 2003.

Filed Aug. 26, 2003.

---

Robert Pfannebecker, Zimmerman, Pfannebecker, Nuffort & Albert, Lancaster, PA, for Petitioner Borough of Columbia.

Charles H. Montange (Argued), Seattle, WA, for Petitioner Shawnee Run Greenway.

Marilyn R. Levitt (Argued), Surface Transportation Board Office of the Secretary, Washington, DC, for Respondent Surface Transportation Board.

Robert J. Wiggers, John J. Powers, III, United States Department of Justice Antitrust Division, Washington, DC, for Respondent United States of America.

Jeffrey O. Moreno, Thompson Hine, Washington, DC, for Intervenor Respondent Frank Sahd Salvage.

Before BARRY and ROSENN, Circuit Judges, POLLAK, District Judge.*

## OPINION OF THE COURT

POLLAK, District Judge.

This case represents the latest chapter in the complex history of a two-and-a-half-mile stretch of rail line located in Lancaster County, Pennsylvania. The track had remained unused for over a decade when petitioner Shawnee Run Greenway, Inc. ("Shawnee"), on April 10, 2001, acquired an option to purchase the rail line from its owner, 1411 Corporation ("1411"—not a party to this proceeding), and operator, Middletown & Hummelstown Railroad Company ("M&H"—not a party to this proceeding).[1] Shawnee planned to remove the rails and develop a trail and greenway along the route. Shawnee's plan was thwarted, however, when the intervenor-respondent Frank Sahd Salvage Center, Inc. ("Sahd") proffered an "offer of financial assistance" ("OFA") to the respondent Surface Transportation Board ("STB"),

and sought to purchase the line from 1411 and M&H with the expressed intent to resurrect the dormant line for freight shipping. The STB approved Sahd's OFA and set the conditions and compensation for Sahd's purchase of the rail line.

Shawnee and petitioner Borough of Columbia take issue with the STB's decision to permit Sahd to purchase the line. The challenge to the decision is based on contentions that (1) the STB acted arbitrarily and capriciously in determining that there was a likelihood that Sahd would actually restore the rail line to use, and (2) the transfer of the line to Sahd amounts to an unconstitutional taking. Having reviewed the proceedings before the STB, we decline to disturb the agency's decision to allow Sahd to purchase the line.

## I. STATUTORY SCHEME

Before describing further the underlying facts of this case, we pause to outline the statutory scheme pursuant to which the STB acted. For almost a century, the federal government has exercised plenary and exclusive authority over the abandonment of freight railroad lines. *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 320–21, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981). Beginning with the Transportation Act of 1920, ch. 91, 41 Stat. 477–478 (1920), that authority was vested in the Interstate Commerce Commission ("ICC"). Through the vehicle of the ICC Termination Act ("ICCTA"), Pub. L. No. 104–88, 109 Stat. 803 (codified in scattered sections of 49 U.S.C.), Congress on Janu-

---

* Honorable Louis H. Pollak, District Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1. While the option contract (dated September 7, 1999) creating the rights assigned to Shawnee makes no mention of M&H, the final purchase contract (dated September 17, 2001) purports to permit Shawnee to "ac-

quire the property from owner [1411] and operator [M&H]." We note that, in different portions of the record, M&H and 1411 are referred to interchangeably as the seller or owner of the property. For purposes of discussion, we will refer to 1411 and M&H as the entities from whom the line was to be acquired.

ary 1, 1996 abolished the ICC and created the STB to perform functions similar to those previously assigned to the ICC. 49 U.S.C. § 10501. Pursuant to the ICCTA, the STB has broad regulatory jurisdiction over "transportation by rail carrier." *Id.* § 10501(a). The term "rail carrier" is defined, in relevant part, as "a person providing common carrier railroad transportation for compensation." *Id.* § 10102(5). A line or railroad may not be taken out of the national rail system, and a railroad may not be relieved of its common carrier obligation, unless the carrier first obtains abandonment authority from the STB. *Id.* § 10903(a)(1).

The procedures by which a carrier applies to the STB for abandonment of a railroad line are captured in 49 U.S.C. § 10903. The STB may permit a proposed line abandonment upon determining that the "present or future public convenience and necessity require or permit the abandonment." *Id.* § 10903(d). Alternatively, the STB may conduct rail abandonment proceedings through the exemption procedures authorized by 49 U.S.C. § 10502. One of the exemption procedures utilized by the STB provides a streamlined mechanism for the abandonment of a rail line if (a) the line has not been used for local traffic for at least two years; (b) overhead traffic on the line can be rerouted; and (c) no shipper has filed a complaint regarding cessation of service over the line. 49 C.F.R. § 1152.50(b). Abandonment pursuant to this exemption is justified by the STB's finding that (1) "its prior review and approval of these abandonments ... is not necessary to carry out the rail transportation policy of 49 U.S.C. § 10101"; and (2) "these transactions are of limited scope

and continued regulation is unnecessary to protect shippers from abuse of market power." 49 C.F.R. § 1152.50(c)(1–2).

Under 49 C.F.R. § 1152.50(d), a carrier seeking authorization for abandonment files a "notice of exemption" with the STB. Within twenty days of the filing, the STB publishes "notice" of the proposed abandonment in the Federal Register. *Id.* § 1152.50(d)(3).

That a carrier has sought STB permission for abandonment often does not end the story. While Congress, in establishing procedures for the abandonment of lines, has sought to assist carriers wishing to be free of lines operating at a loss, it has also recognized the competing interest of maintaining established lines (or at least the right-of-way) to meet shippers' present and future needs for railroad freight service. *See Hayfield N. R.R. Co. v. Chicago & N.W. Transp. Co.*, 467 U.S. 622, 630, 104 S.Ct. 2610, 81 L.Ed.2d 527 (1984) (referring to "Congress' efforts to accommodate the conflicting interests of railroads that desire to unburden themselves quickly of unprofitable lines and shippers that are dependent upon continued rail service"); *Preseault v. ICC*, 494 U.S. 1, 5, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) (describing "congressional efforts to preserve shrinking rail trackage"). When a line is abandoned, the property upon which the tracks are laid—property the carrier commonly holds by an easement—commonly reverts to owners of the properties adjoining the former track area. *Preseault*, 494 U.S. at 8, 110 S.Ct. 914. This means that it may be very difficult to cobble together a contiguous strip of land for a future rail line once abandonment is consummated.[2] There-

---

**2.** This practical problem has been succinctly described:

 When railroad lines are abandoned, they do more than simply fall into disrepair; if the

grants of land are in the form of an easement (which terminates in favor of the servient estate when abandoned) or fee simple determinable (which triggers a future inter-

fore, Congress has charged the STB with administering certain statutory "remedies" that avoid the abandonment of rail lines. For the purposes of the instant litigation, two remedies are of particular importance: (1) offers of financial assistance ("OFAs") under 49 U.S.C. § 10904; and (2) "railbanking" under 16 U.S.C. § 1247(d).

### A. Offers of Financial Assistance

When a carrier has applied to abandon a rail line, "any person" may file an OFA, which is an offer to purchase or subsidize a rail line and so to facilitate continued freight rail service. 49 U.S.C. § 10904(c); 49 C.F.R. § 1152.27(f). When a timely OFA is filed and the STB finds that the offeror is "financially responsible," the STB must postpone abandonment authority pending completion of the OFA process. 49 U.S.C. § 10904(d)(2).

When an OFA is on the table, the offeror and the rail carrier are free to negotiate the terms of the putative transaction. *Id.* § 10904(d)(2). If they fail to reach an agreement, either the offeror or the rail carrier, within thirty days of the OFA, may request that the STB set the conditions and amount of compensation for the transaction. *Id.* § 10904(e). Within thirty days of the request to establish conditions and compensation amount, the STB renders its decision. *Id.* § 10904(f)(1)(A). Once the STB sets the conditions and compensation, the railroad is bound to those terms, but the OFA proponent has ten days to withdraw the OFA before being bound to the STB's decision. *Id.* § 10904(f)(2).

Once the offeror purchases the rail line, whether through a negotiated agreement or pursuant to the conditions and compensation set by the STB, the abandonment proceeding is dismissed. 49 C.F.R. § 1152.27(f)(2). When an offeror acquires a line under § 10904, it may not seek to transfer or discontinue service on the line for at least two years. 49 U.S.C. § 10904(f)(4)(A).

### B. Railbanking

The second relevant method of preserving a rail line right-of-way is referred to as "railbanking"—a process in which an entity willingly assumes responsibility for a line and establishes a public trail along the route. 16 U.S.C. § 1247(d) (known as the "Rails-to-Trails Act"). The interim trail use "shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes," and is subject to restoration or reconstruction for railroad purposes. *Id.*

The STB's regulations implementing § 1247(d) comprise procedural steps somewhat analogous to those involved in an OFA. 49 C.F.R. § 1152.29. Each entity seeking trail use files a "Statement of Willingness To Assume Financial Responsibility" with the STB. *Id.* § 1152.29(a)(3). These "statements" must be filed within ten days of publication of the notice of exemption in the Federal Register. *Id.* § 1152.29(b)(2). If the railroad agrees to negotiate regarding prospective trail use, then the STB issues a Notice of Interim Trail Use or Abandonment ("NITU"), which permits the railroad to discontinue service in favor of interim trail use, subject to future restoration of rail service. *Id.* § 1152.29(d)(1–2). Importantly, unlike

---

est) the possessory estate is transformed into fee simple absolute. In such cases, the railroad loses all right to the easement upon abandonment. Railroads fear that should demand for rail transport rise in the future, the lost easements would be extremely difficult and expensive to regain.

Emily Drumm, Note, *Addressing the Flaws of the Rails-to-Trails Act*, 8 Kan. J.L. & Pub. Pol'y 158, 159 (1999) (footnotes omitted).

OFA offers, railbanking requests are not binding upon the rail line—accepting a railbanking offer is at the discretion of the carrier.

## II. FACTUAL AND PROCEDURAL HISTORY

Having set forth a summary of the statutory framework governing abandonment, OFAs, and railbanking, we now turn to the facts of the instant case and their place in that framework.

This case involves a two-and-a-half-mile stretch of railroad located in Lancaster County, running from an urban setting into open farmlands, and terminating in a field about 250 feet north of a highway. The right-of-way along the span of the line fluctuates between twenty and sixty feet in width.

The line has changed hands a number of times in the many decades of its existence. On April 1, 1864, the Reading & Columbia Railroad ("R&C") opened a 39.5–mile line (which included the 2.5–mile section at issue here). R&C was merged into the Reading Company on December 31, 1945. Consolidated Rail Corporation ("Conrail") acquired the 39.5–mile line on April 1, 1976. Conrail, in 1982, transferred the relevant 2.5–mile portion of the line to ITT Grinnell, and abandoned the remainder of the line (subsequent references to the "line" refer only to the 2.5–mile stretch). ITT Grinnell, in turn, transferred the line to its wholly owned subsidiary, 1411. 1411 was then sold to M&H in 1986. The last carload of freight on the line was transported in December of 1990.

As the line lay fallow, changes in its physical characteristics and legal status distanced it from usefulness as an interstate railroad. In 1994, the Borough of Columbia ("Columbia") removed the rails at a railroad crossing and repaved the street at the intersection. In 1997, Conrail removed the connecting switch to the main line, thereby severing the link to the interstate tracks. In 2000, the Commonwealth of Pennsylvania paved over another crossing, and the line was embargoed.[3]

In the early 1990s, Sahd—which operates a salvage yard immediately adjacent to the tracks and had, at times, shipped on the line—expressed interest in acquiring the line, but the deal fell through. According to the verified statement of Wendell J. Dillinger, the president of M&H and 1411, Sahd expressed no interest in the line between 1993 and 2000. In 1999, Mr. Dillinger described the line as "unproductive" and advocated a "rails-to-trails" plan so that M&H and 1411 might avoid selling the line piecemeal to the adjacent property owners.

On September 7, 1999, Michael Stark, a local businessman, purchased an option to acquire the line from M&H and 1411 and establish a greenway. Mr. Stark then assigned the option to petitioner Shawnee. Shawnee, in preparing to establish the greenway, made payments toward the purchase price and commissioned boundary surveys and environmental analysis. A "Master Plan" for the greenway was prepared in January 2001 under the auspices of the Pennsylvania Department of Conservation and Natural Resources, Columbia, West Hempfield Township, and the Columbia Downtown Development Corporation. The Master Plan noted that "[o]ne property owner [presumably Sahd] indicat-

---

**3.** An embargo, as described by the Supreme Court, "is a temporary emergency suspension of service initiated by filing of a notice with the [STB]." *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 314 n. 2, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981). If justified, an embargo relieves the carrier of liability for failing to provide transportation. *ICC v. Chicago, Rock Island, & Pac. R.R. Co.*, 501 F.2d 908, 911 (8th Cir.1974).

ed that they would like to see rail with trail [as opposed to a trail established after removing the rails]." However, after considering the requirements for operating the rail, the drafters of the Master Plan concluded that "a rail with trail alternative in all likelihood would be economically and institutionally infeasible."

M&H and 1411 filed a notice of exemption under 49 C.F.R. § 1152.50 on March 23, 2001, thus initiating abandonment proceedings. Shawnee then, on April 17, 2001, invoked the railbanking statute, 16 U.S.C. § 1247, by filing a timely "Statement of Willingness To Assume Financial Responsibility," as prescribed by 49 C.F.R. § 1152.29(a)(3). Three days later, on April 20, 2001, Sahd filed a timely notice of intent to file an OFA. Sahd requested and received from the STB an extension of time for filing the OFA. On July 5, 2001, Shawnee filed a motion requesting the STB to exempt the abandonment proceedings from the OFA provisions and to bar Sahd's OFA. Nonetheless, Sahd filed its OFA on July 11, 2001. On July 16, 2001, the STB found Sahd to be a financially responsible entity and further postponed the effective date of the abandonment exemption. Soon thereafter, on July 30, 2001, Shawnee filed a motion to dismiss the OFA.

Shawnee's motion to exempt the abandonment proceedings from the OFA process and its motion to dismiss Sahd's OFA were denied on September 6, 2001. The September 6 decision found that the OFA submitted by Sahd was bona fide, and that there was "no basis for undercutting the Congressional objective of maintaining rail service." Although Sahd had not used the line since 1990, the STB found credible Sahd's explanation that a shift in its customer base in recent years had made shipping by rail more attractive than truck service.

Even as the proceedings before the STB transpired, Shawnee, on September 17, 2001, exercised the option it had acquired from Mr. Stark and entered into a contract to purchase the line from M&H and 1411 for $125,000.

Meanwhile, its own private negotiations for the acquisition of the line having borne no fruit, Sahd, on September 17, 2001, filed a request for conditions and compensation for the transaction to be set. By letter of September 25, 2001, Shawnee asked the STB to require Sahd to reimburse Shawnee for its equitable interest in the line. On October 18, 2001, the STB established a purchase price of $125,000, and did not address Shawnee's request for reimbursement. Sahd accepted the conditions and compensation on October 29, 2001, and the sale was approved by the STB on November 6, 2001. Sahd submitted a "petition for clarification" on November 29, 2001, so that the STB might resolve uncertainty regarding environmental liability issues associated with the OFA. STB postponed the due date for closing until 45 days after it reached a decision on the petition for clarification.

While the petition for clarification was pending, Columbia filed a motion with the STB seeking an extension of time to file a response. In the submission, Columbia expressed itself as "extremely concerned that Sahd Salvage Company in fact is employing the OFA process as nothing more than a means to shield the property in question in this proceeding from the legitimate process of federal, state or local law, at great cost and expense to the citizens of the Borough, and with no countervailing public benefit." The STB denied the motion, opining that Columbia was attempting to reopen the administratively final decision to grant an OFA, rather than responding to the petition for clarification. Later, on April 12, 2002, the STB granted

the petition for clarification, and resolved the environmental liability issues in favor of Sahd.

Columbia, on May 2, 2002, filed with the STB a "Notice, Appeal and Petition" that again challenged Sahd's good faith. In the submission, Columbia asserted that Sahd "has refused to disclose any plans or data showing how it would use the line for rail purposes, or whether it will use the line for rail purposes at all." Columbia also reported that it had made a proposal to Sahd in April of 2002—which proposal Sahd rejected. The terms of the proposal called for Sahd withdrawing its OFA, Columbia acquiring the property, and Sahd operating the rail line. On May 30, 2002, the STB treated the May 2, 2002 submission as a motion to reopen, and "conclude[d] that Columbia [had] failed to demonstrate any grounds for reopening [the] April decision."

Sahd purchased the line from M&H and 1411 on May 30, 2002. Columbia and Shawnee filed the instant petition for review on June 11, 2002.

### III. DISCUSSION

Columbia and Shawnee argue that: (1) the STB departed from its own established precedent without reasoned explanation; and (2) the STB's approval of the OFA effected an unconstitutional "taking" of Shawnee's property.

*A. Did the STB depart from its own precedent without reasoned explanation?*

■ Under the Administrative Procedure Act, reviewing courts are to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). If an agency departs from its own precedent without a reasoned

explanation, the agency may be said to have acted arbitrarily and capriciously. *Donovan v. Adams Steel Erection, Inc.,* 766 F.2d 804, 807 (3d Cir.1985).

In this case, the petitioners contend that the STB's decision to accept Sahd's OFA represents an unreasoned departure from established STB precedent requiring an adequate demonstration of a bona fide intent to continue freight rail service. That established precedent, it is argued, is reflected primarily in a recent appellate decision upholding an STB ruling—*Kulmer v. STB,* 236 F.3d 1255 (10th Cir.2001).

The Tenth Circuit in *Kulmer,* and the Ninth Circuit in a similar case, *Redmond–Issaquah Railroad Preservation Ass'n [RIRPA] v. STB,* 223 F.3d 1057 (9th Cir. 2000), weighed STB determinations which were, procedurally, the obverse of the case at bar. In each instance, the STB had denied the OFA presented to it, and the offeror petitioned the circuit court for a holding that the STB was acting outside the scope of its statutory authority by weighing the probability of continued rail service. In both instances, the circuit courts deferred to the STB and held that the agency was entitled to pursue such an inquiry. While *Kulmer* and *RIRPA* involved claims that the STB acted improperly by considering the likelihood of continued rail service, the petitioners in this case, by contrast, claim that the STB shirked its supposed duty to conduct a searching evaluation of that likelihood. Distilled to its essence, the petition now before this court seeks findings that: (1) the STB is obliged to evaluate the likelihood of continued rail service; and (2) the STB's determination that Sahd genuinely contemplated continuing rail service was, as a matter of law, without adequate evidentiary support. We will address these two propositions in turn:

*1. Is the STB obliged to evaluate the likelihood of continued rail service?*

In the order reviewed by the Tenth Circuit in *Kulmer,* the STB denied an OFA that proposed to purchase an abandoned rail line. The agency found that the offerors did not have good-faith plans to provide continued rail service on the line. The STB stated:

. The OFA process is designed for the purpose of continuing to provide freight rail service, and is not to be used to obstruct other legitimate processes of law (whether Federal, state, or local) when continuation of such service is not likely. [citations omitted] Accordingly, when disputed, an offeror must be able to demonstrate that its OFA is for continued rail freight service. [citations omitted] Where, as here, the line is not currently active, there must be some assurance that shippers are likely to make use of the line if continued service is made available, and that there is sufficient traffic to enable the operator to fulfill its commitment to provide that service. [citations omitted]

*Roaring Fork R.R. Holding Auth. – Abandonment Exemption – in Garfield, Eagle, and Pitkin Counties, CO,* STB Docket No. AB–547X at *2 (served May 21, 1999) (available at 1999 WL 323347).

The STB found lacking the *Kulmer* offeror's evidence of projected rail use, and pointed to three specific deficiencies in the OFA. First, although five potential shippers were identified, three were not in a position to use the line and the traffic projections for the remaining two were "too indefinite and insufficient to support continued freight rail operations." Second, the offeror had acknowledged "that continued freight service would not be self-sustaining." Finally, the offeror did not intend to use the line for continued freight service, but instead, for passenger service—the same use planned by the existing owner of the line. *Id.* at *3.

The Tenth Circuit affirmed the STB's decision and rejected the offeror's claim that the STB was statutorily barred from considering rail-service continuation as a factor in approving an OFA. *Kulmer,* 236 F.3d at 1257. The court noted that "while Congress has not specifically required the STB to consider continued rail service as a factor, there is no basis in the statute for concluding that Congress has specifically prohibited the STB from doing so." *Id.*

In *RIRPA,* the Ninth Circuit upheld a similar dismissal of an OFA in which the applicant, according to the STB decision that formed the basis for the petition for review, did nothing more than "merely hold[ ] out the possibility of service at some unspecified future time." *The Burlington N. & Santa Fe Ry. Co.—Abandonment Exemption—in King County, Wa. in the Matter of an Offer of Fin. Assistance,* STB Docket No. AB–6 (Sub–No. 380X) at *4 (served Aug. 5, 1998) (available at 1998 WL 452837). The Ninth Circuit opined that, given "the STB's exclusive province to draw legitimate inferences from the evidence," the conclusion that "there was no potential for future traffic and that RIRPA was not interested in offering rail service" was reasonable. *Redmond–Issaquah Railroad Preservation Ass'n [RIRPA] v. STB,* 223 F.3d 1057, 1064 (9th Cir.2000). Accordingly, the court affirmed the denial of the OFA.

■ *Kulmer* and *RIRPA* are persuasive authority that the STB *may* evaluate the likelihood of continued rail service when presented with an OFA. We see no reason to disagree. We need not today decide whether the STB *must* conduct such an evaluation, because in this case the agency expressly considered the evidence bearing on Sahd's announced expectation to re-

sume freight service. With respect to Sahd's interest in continued rail service, the STB wrote:

Shawnee's main argument is that the Line is not needed because it has not been used in recent years. The fact that a line has not carried any traffic in a decade could support the argument that there is no call for continued rail service. Here, however, Sahd has offered a convincing explanation for its recent reliance on trucks and its desire to resume using rail service, and it points to its past use of the Line and its previous attempts to buy the Line. Shawnee notes that Sahd has not documented its claim by submitting contracts with the southern customers that it has named, but we do not believe that such evidence is needed here.

Shawnee argues that Sahd's line of work necessarily impeaches the bona fides of its commitments and shows that Sahd is only interested in scrapping the Line. But Sahd did not find the Line by canvassing likely candidates to buy and liquidate. Sahd has been located on the Line for many years, and has made extensive use of it for transportation service in connection with its business. Moreover, Sahd would have to purchase all the assets of the line, including a fee simple interest in the underlying real estate, and would be precluded from disposing of the Line for at least 2 years. The high price of the real estate relative to the price of the rail and the restrictions in section 10904 on disposal of the assets of a rail line make acquisition of the M&H Line solely to obtain the rail an unattractive and therefore unlikely proposition.

Shawnee argues that restoration of rail service would be uneconomic because rehabilitation and maintenance costs would be prohibitively expensive. But, although Shawnee offers a list of costs (such as reconnecting the Line with the adjacent through track, reestablishing crossings at four streets, and reconditioning the line), Shawnee offers no support for its assertion that these costs will add up to $300,000.

*1411 Corp.—Abandonment Exemption —in Lancaster County, PA,* STB Docket No. AB–581X at *3 (served Sept. 6, 2001) (available at 2001 WL 1016782) (footnotes omitted).

Because the STB undertook to weigh the bona fides of Sahd's OFA, and because that weighing was in harmony with past STB precedent, it follows that the limited role of this court is to determine, once the STB has accepted the bona fides of an OFA, whether a certain quantum of evidence need support the result.

2. *As a matter of law, was the STB's determination that Sahd genuinely contemplated continuing rail service without adequate evidentiary support?*

 The language quoted from the STB's discussion of Sahd's probability of resuming rail service reveals that the agency thought it unlikely that Sahd was purchasing the line for its scrap value, and, further, was satisfied that Sahd intended to resume use of the line to ship to named southern customers.

In challenging the sufficiency of the STB's evaluation, the petitioners have leveled a barrage of criticism at the agency's conclusion, arguing that: (1) Sahd's acquisition of the line amounts to nothing more than "railbanking," for which an OFA is not the appropriate mechanism; (2) "Sahd presented no rail plans, no time table to reactivate service, no means to finance restoration of crossings and rehabilitation of the embargoed track, no economic forecasts, no guarantees of service, no contracts with shippers, no showing of any

railroad management experience or skills, and no showing of any rail equipment or anyone to operate the equipment"; and (3) the STB failed to "require Sahd to show that its projections of traffic were reasonable and that the level of rail traffic projected would be sufficient to sustain rail service." To be sure, the STB has, in *Roaring Fork,* 1999 WL 323347 at *2, stated that where a "line is not currently active, there must be some assurance that shippers are likely to make use of the line if continued service is made available, and that there is sufficient traffic to enable the operator to fulfill its commitment to provide that service." But it must be remembered that the STB is engaging in a comprehensive examination of the facts in each OFA/abandonment proceeding. For this court to hold *as a matter of law* that the STB must require a certain level of evidence in one segment of that examination would be to ignore that Congress has tasked that agency, not this court, with factfinding responsibilities. In *Roaring Fork,* the STB found that the shipping projections were too "indefinite and insufficient." Here, the STB found no such deficiencies in Sahd's proof. Evaluating and comparing minutiae in the evidence such as the definiteness and sufficiency of one projection relative to others would be neither a desirable nor a practicable level of review for this court to undertake— especially when it is the STB's "exclusive province to draw legitimate inferences from the evidence." *RIRPA,* 223 F.3d at 1064.

Moreover, we are not convinced that the body of STB precedent requires, in every instance, a showing of financial feasibility or a roster of committed shippers. We quote here at some length from the Ninth Circuit's *RIRPA* opinion, which sheds useful retrospective light on prior ICC and STB pronouncements on OFA evidentiary requirements:

Most significantly, RIRPA argues that the STB failed to distinguish the decision here from its ruling in *Illinois Cent. R.R. Co.—Abandonment Exemption—in Perry County, IL,* STB Docket No. AB–43 (Sub–No. 164X) (served Nov. 8, 1994) [ (available at 1994 WL 613355)], wherein it held that recent actual service is not required for OFA approval. In *Perry County,* the ICC considered an OFA, submitted by Freeman United Coal Mining Company ("Freeman"), to purchase a 6.2 mile line being abandoned by the Illinois Central Railroad Company ("Illinois Central") due to low demand for coal and expiration of long-term supply contracts. Freeman owned a coal mine at the terminus of the line and wanted to preserve rail freight service pending the return of favorable market conditions. Illinois Central opposed the OFA, arguing that the line had been inactive for three years. While acknowledging Illinois Central's opposition, the ICC countered that it had never required recent actual service for OFA approval and explained that its role was to preserve the potential for transportation. The ICC therefore approved the OFA based on its finding that Freeman was offering to subsidize the line with a view to securing it for rail purposes in order to tender coal for transport as soon as it had coal to offer.

The STB, in denying RIRPA's OFA, distinguished the instant case from *Perry County* on the facts:

RIRPA's reliance on *Perry County* is misplaced. There, the owner of an inactive coal mine was willing to make payments to the railroad to preserve a line from which the mine owner received no immediate benefit whatever. The offeror's willingness to do so manifested a strong intent to use the line for rail service in the future if the mine were

again to become active. No other reason existed for the mine's owner to make the payments. *Here, there is no evidence to suggest that RIRPA has a similar interest in acquiring the line to preserve the line for future rail service. The issue is not whether service is currently being provided, but whether the circumstances in their entirety indicate that the financial assistance is being offered for rail service.* The evidence in *Perry County* indicated that the answer was yes. The evidence here indicates that the answer is no. [*The Burlington N. & Santa Fe Ry. Co.—Abandonment Exemption—in King County, Wa. in the Matter of an Offer of Fin. Assistance* [*Burlington*], STB Docket No. AB–6 (Sub–No. 380X) at *4 (served Aug. 5, 1998) (available at 1998 WL 452837).] *RIRPA,* 223 F.3d at 1063–64 (emphasis added by *RIRPA* court).

It is worth emphasizing that the STB in *Burlington* (quoted by *RIRPA* in the italicized language *supra*) noted that it looks to the "circumstances in their entirety" to determine whether an OFA is supported by a genuine possibility of the implementation of rail service in the future. The *Perry County* case cited in *Burlington* shows that the STB precedent does not require the sort of demonstration that the petitioners would have the agency require—"rail plans," a "time table to reactivate service," "means to finance restoration of crossings and rehabilitation of the embargoed track," "economic forecasts," "guarantees of service," "contracts with shippers," "showing of railroad management experience or skills," "rail equipment," "personnel to operate the equipment," and "projections of rail traffic" that are deemed "reasonable." To be sure,

those factors may all be considered by the STB, but they represent only a small cross-section of the types of evidence that aid in evaluating the "circumstances in their entirety." We find persuasive the STB's characterization of its own precedent, as stated in the decision challenged by the instant petition for review:

*Roaring Fork* does not set out a rigid test requiring an offeror to demonstrate that the line would be viable. It merely requires a sufficient showing to support a finding that an offer is, indeed, for continued freight service and not for some other purpose. As to that requirement, we believe that Sahd has met its burden. Sahd, which would be the principal shipper on the line,[4] ships 15,000 to 25,000 tons of scrap metal annually, and it has projected that it will ship 70–90 cars per year. While it has not yet nailed down firm contracts for other traffic that is apparently available, a party filing an OFA does not need to prove in advance that its efforts to revive a failing line will without question succeed.

*1411 Corp.—Abandonment Exemption—in Lancaster County,* PA, STB Docket No. AB–581X at *3 n. 9 (served Sept. 6, 2001) (available at 2001 WL 1016782).

We do not suggest that the evidence supporting the STB's decision is overwhelming. It is, manifestly, modest. A reasonable factfinder could have found Sahd's demonstration in support of the OFA unpersuasive. Indeed, it is not inconceivable that the members of this panel, had we been members of the STB, would have arrived at a conclusion different from that arrived at by the STB. But as members of a reviewing court we are

---

4. The STB also found persuasive the fact that Sahd was not just the proponent of the OFA, but also the primary shipper on the line. *See 1411 Corp.,* 2001 WL 1016782 at *3 n. 7.

limited to inquiring whether the STB's decision had some evidentiary support and was reasonably consistent with the agency's own precedent. And we hold that the STB has not acted arbitrarily and capriciously in this case, since the decision has some support in the record and the agency's explanation of how its decision comports with agency precedent is not unreasonable. In fact, Sahd's situation appears analogous to that of the OFA offeror in the *Perry County* matter: the STB in that case approved the OFA submitted by the owner of an inactive coal mine who intended to use the line in the future should the mine later become active. In Sahd's case, the STB approved the OFA submitted by the owner of a salvage yard who intends to use the line should it become cost-effective to ship to southern customers. Far from departing from past precedent, the STB's approval of Sahd's OFA is in lock-step with the precedent of *Perry County*. A different result obtained in *RIRPA* because the STB determined that there was "no evidence" that RIRPA had an interest in preserving the line for future rail service, and in *Kulmer* because the STB found the projections of future rail service "too indefinite and insufficient to support continued freight rail operations." Here, the factfinder—STB—found convincing evidence—evidence which it identified—of

genuine interest in returning the rail line to use, and this court is without authority to disturb that conclusion.[5] We decline the petitioners' invitation to this court to reassess the record evidence relied on by the STB. Because we do not today disturb the STB's conclusions, the petitioners' corollary argument—that Sahd's proposal amounted to nothing more than railbanking, and so should not have been given preference over Shawnee's railbanking proposal—is beside the point. The STB found that the OFA was for continued freight service, a finding that clearly signified that Sahd's OFA represented more than a mere attempt at railbanking.

## B. Did the STB violate the Fifth Amendment by effecting an unlawful taking?

■ The petitioners also contend that the STB violated the Fifth Amendment by effectively taking property for non-public use when it accepted Sahd's OFA. Our decision that the STB did indeed weigh the bona fides of Sahd's intent to resume rail operations erodes the foundation for such an argument. The Supreme Court has counseled in favor of deference to legislative decisions when determining what constitutes "public use," *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 241, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984) ("In short, the

5. The *Kulmer* case further supports this court's deference to the STB. The Tenth Circuit observed that the STB can and will require different types of proof in different types of cases:

> It is true that OFA approval does not require proof of some minimum amount of rail traffic. The ICC (the STB's predecessor) expressed the view that such a requirement "could impose an obstacle to rail service *in some cases.*" *Exemption of Rail Line Abandonments or Discontinuance—Offers of Fin. Assistance,* 4 I.C.C.2d 164, 167 (1988) (emphasis added). For instance, where there is credible evidence that an OFA would result in continued rail service

despite the fact that the service would not be self-sustaining, a minimum traffic requirement would be prohibitive. To illustrate, in [*Perry County*], the offeror, who owned an inactive coal mine along the rail line in question, wanted to subsidize the rail carrier to maintain freight rail service although the line was inactive and it was unknown when anyone, including the offeror, would use it in the future. Under the circumstances, the offeror's willingness to subsidize a line from which it could derive no benefit besides potential freight rail service persuaded the STB that the OFA was, in fact, for continued rail service.

*Kulmer*, 236 F.3d at 1258.

Court has made clear that it will not substitute its judgment for a legislature's judgment as to what constitutes a public use 'unless the use be palpably without reasonable foundation.'" (quoting *United States v. Gettysburg Elec. Ry. Co.*, 160 U.S. 668, 680, 16 S.Ct. 427, 40 L.Ed. 576 (1896))), and this court has heeded that direction, *Hughes v. Consol–Penn. Coal Co.*, 945 F.2d 594, 612 (3d Cir.1991) (citing *Midkiff*). We have expressly noted that even if "the motive for taking is to give to a private party," it "can still fall within . . . public use," for "under the United States Constitution 'public use' is a broad concept." *Hughes*, 945 F.2d at 612–13. The OFA procedure avoids abandonment of rail lines and so comports with the expressed policy of Congress to "ensure the . . . continuation of a sound rail transportation system . . . to meet the needs of the public and the national defense." 49 U.S.C. § 10101(4); *see also* 49 U.S.C. § 10904 (statute's caption reads "Offers of financial assistance to avoid abandonment and discontinuance"). The STB applied the OFA statutory provisions established by Congress to serve the public use. In light of the precedent granting Congress a wide berth in determining what constitutes public use, we are loath to second-guess the factual determinations of the agency to which Congress has assigned decision-making responsibility in OFA proceedings.

When asked at oral argument which of the two petitioners bore the brunt of the allegedly unconstitutional taking, petitioners' counsel suggested that Shawnee, because it had purportedly invested $30,000 to $40,000 in the project and had entered into a contract to buy the line, suffered a taking as the "equitable owner."

The Supreme Court has instructed that "[c]ontracts, however express, cannot fetter the constitutional authority of the Congress. Contracts may create rights of property, but, when contracts deal with a subject-matter which lies within the control of the Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them." *Norman v. Baltimore & Ohio R.R. Co.*, 294 U.S. 240, 307–08, 55 S.Ct. 407, 79 L.Ed. 885 (1935) (quoted in *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 223–24, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986)).

■ In determining if a taking occurred, we are to engage in an "ad hoc, factual" inquiry into the circumstances of this particular case, guided by three factors of particular significance: (1) "the extent to which the regulation has interfered with distinct investment-backed expectations"; (2) "the economic impact of the regulation on the claimant"; and (3) "the character of the governmental action." *Connolly*, 475 U.S. at 224–25, 106 S.Ct. 1018.

We begin with the element most crucial to this case—"the extent to which the regulation has interfered with distinct investment-backed expectations." Even a cursory examination of the context in which the contractual negotiations took place makes clear that Shawnee's investment-backed expectations necessarily included the understanding that unfavorable STB actions might scuttle the railway deal. That the negotiating parties were continually aware that any agreement reached was subject to the outcome of STB proceedings is evident from the face of the two contracts executed.[6] The 1999 contract by which Michael

---

6. The two contracts to which we refer are those discussed in the factual recital *supra*—the contract by which Michael Stark obtained an option to purchase the line on September 7, 1999, and the contract to purchase the line executed by Shawnee on September 17, 2001

Stark acquired an option to buy the railway specified that "[t]he final sale shall be contingent upon completion of all processes necessary for a 'Rails to Trails' conversion, *including successful abandonment of the rail line.*" (emphasis added) Eventually, the Stark option was assigned to Shawnee, and Shawnee in turn entered into a contract to purchase the line. That contract, too, contemplated that the road to the sale's consummation led through the STB: "Purchaser and Railroad shall cooperate in, and use their best efforts to complete all necessary filings at the [STB] for notices of interim trail use (railbanking) or abandonment for the line...." A subsequent clause provides that the "[p]urchaser shall not be obligated to proceed to closing unless an order rendering [16 U.S.C. § 1247(d)] applicable to the premises is effective." It is thus apparent that Shawnee's actions were all taken against the backdrop of a statutory and administrative environment in which certain STB actions were needed before either contract's purpose could be effected. Shawnee cannot be said to have been surprised that the STB's decisions might thwart its goals—the option contract Shawnee acquired and the purchase contract it executed both provided for that contingency.[7] Shawnee knew it was contracting for a privilege that would only be available if the STB issued certain orders.[8] When those orders were not forthcoming, Shawnee's contract was not *taken* from it; rather, one of the conditions to contractual performance was simply not met. Far from improperly destroying or usurping Shawnee's contractual rights, the STB merely acted out of its acknowledged discretion within the framework described by the contracts themselves.

The second and third elements need only passing mention, given our finding that Shawnee had no right to expect STB to permit abandonment of the line. We find the economic impact on Shawnee to be minimal – the contingency clauses in the option contract and the final contract absolved Shawnee of obligation to purchase the line if the attempt at railbanking failed. The $30,000 to $40,000 Shawnee reports to have spent on the project was spent at Shawnee's own risk, given the uncertainties inherent in the transaction. Finally, the government action here was taken with the implicit goal of preserving a railway for the common good. As discussed *supra*, we will not disturb the STB's conclusion that Sahd's OFA was an appropriate means for accomplishing that goal.

The petition for review is DENIED.

ROSENN, Circuit Judge, dissenting.

In this heated controversy over a 2.5 mile long dead-end rail track, the Surface Transportation Board (STB) has accepted

(after Shawnee had been assigned Mr. Stark's option).

7. At the time it signed the second contract, Shawnee had to be aware that the prospects of abandonment were in doubt – Shawnee executed the contract to purchase the line on September 17, 2001, eleven days *after* Shawnee's motion to dismiss Sahd's OFA was denied by the STB.

8. Shawnee argues that "[t]he evidence below is unequivocal that Shawnee had a reasonable investment-backed expectation," based on the

verified statement from Mr. Dillinger that "[i]n 1999 [when the contract was first signed], there was no reason why Michael Stark, [Shawnee], or [M&H/1411] should have thought that Sahd Salvage would again be interested in rail service." The limitation of Mr. Dillinger's statement lies in its specificity – even if nobody thought in 1999 that Sahd might submit an OFA, it has not been suggested why it might not be reasonably anticipated that Sahd might change his mind or that someone else might come along and submit an OFA.

an "Offer of Financial Assistance" (OFA) from a company engaged in the scrap metal business. The offer is neither to assist an existing distressed railroad nor to assist an impoverished railroad in resuming operation. Rather, the offer is to enable the offeror to obtain a valuable piece of land on the basis of a three-fold speculation that it can rehabilitate a dismantled railroad, that it has the ability to operate a railroad, and finally that it may have in the future customers or shippers who will use the railroad. The OFA is from a company without any experience in operating a railroad and is based solely on the vague and unsupported statement of Ronald G. Sahd (Ronald), its president. Without credible evidence to support its decision, the Board acted arbitrarily and capriciously. I, therefore, respectfully dissent.

## I.

A brief statement of the pertinent facts preceding the OFA may be helpful in putting this dispute in perspective. The dead-end track on land (hereinafter "the corridor") owned by the Middletown and Hummelstown Railroad Co. (M&H) and the 1411 Corporation runs through the center of Columbia Borough and terminates in an open field in West Hempfield Township, Lancaster County, Pennsylvania. At one time, it formed part of a branch line acquired by Consolidated Rail Corporation (Conrail) in 1976 to serve one customer, ITT Grinnell, for its outbound shipments. ITT Grinnell subsequently acquired a small part of the line from Conrail (milepost 39.3 to milepost 37.2) in 1982. Grinnell, having no interest in operating a railroad, transferred the line to a wholly owned subsidiary, 1411 Corporation. When Grinnell converted its coke-fired furnaces to electricity in 1986, rendering the line unnecessary, it sold 1411 to M&H. M&H Railroad purchased it in the expectation that it, too, would serve one custom-

er, Colonial Metals. Colonial Metals, however, made only one outbound shipment in the year 1990. There has been no service since 1990 and what remains of the line is a 2.5 mile remnant that is the subject of this litigation. Since 1990, no shipper has utilized the line.

Frank Sahd Salvage Center (Sahd) on occasion had used the line to ship scrap metal. The President of the M&H Railroad and 1411 Corporation averred that Sahd's last shipment of scrap was in February 1988 and it received two carloads of machinery in 1990. In November 1992, Sahd indicated some interest in purchasing the line. On August 5, 1993, Sahd's attorney informed M&H that it was "no longer interested in acquiring 1411." In the ensuing years, the remnant was dismantled without objection from anyone. Conrail removed the interchange switch, Columbia Borough removed the track from the in-town Fourth Street Crossing, and the Commonwealth of Pennsylvania paved over the Route 462 crossing.

Having no information of any shipping interest in the remaining trackage, 1411 Corp. and M&H entered into an option agreement to sell it and the adjoining land to Michael Stark, a local businessman. Stark planned to use the rail stub for railbanking and trail/greenway purposes. He paid $4872 for the option and assigned it in April 2001 to Shawnee Run Greenway, Inc. (Shawnee), a Pennsylvania nonprofit corporation. Shawnee made an additional $4872 payment toward the purchase price to keep the option open until M&H Railroad and 1411 Corporation obtained STB approval for the abandonment of the remnant line. Shawnee also spent $17,000 for boundary surveys and environmental analysis.

For several years prior to the option contract, important local, county, and

State figures recognized the desirability of preserving the corridor for open space, conservation purposes, and as part of a countywide greenway system. Columbia Borough's 1995 Comprehensive Plan recommended that the land be preserved as open space. Lancaster County's 1992 Regional Open Space Plan, which included Columbia Borough, contemplated the potential conversion of the corridor to a trail as part of the countywide greenway system.

Likewise, the Commonwealth of Pennsylvania envisioned the corridor as a component of the state's greenway network. The County's 2000 Bicycle & Pedestrian Plan also cited the corridor as a future component of a county bicycle trail system. Columbia Borough, West Hempfield Township, and the Pennsylvania Department of Conservation and National Resources funded a comprehensive Master Plan completed in 2001 for the preservation of the corridor as a vehicle-free linear open space. The Plan included the corridor as public open space for walking, biking, and jogging, where "visitors of all ages and abilities will observe historic, cultural, and environmental elements traversing a diverse palette of landscapes." The planning process provided for public input. No party, including Sahd, informed any of the planners of an interest in preserving the land for railway purposes.[1]

Shawnee ultimately converted its option into a contract to purchase the corridor for $125,000. 1411 and M&H filed public notices of exemption to abandon service on April 12, 2001, effective May 12, 2001. On July 11, 2001, Sahd filed its OFA which stayed the effective date of the exemption.

On April 8, 2002, Columbia Borough reaffirmed by Council Resolution the consistency of the trail and greenway use with local and regional land use plans. It also noted that "possible future rail needs can be amply served by preserving the inactive line intact pursuant to the federal interim trail use and railbanking statute [16 U.S.C. § 1247(d)]." The Resolution expressly supported the development of a greenway and trail line, consistent with local land use plans.

The STB ultimately rejected Shawnee's challenge to Sahd's offer and denied Shawnee's alternative request to exempt the line under 49 U.S.C. § 10502 from the forced sale provisions of 49 U.S.C. § 10904. STB based its approval of the OFA solely on Sahd's "convincing explanation for its recent reliance on trucks and its desire to resume using rail service." The STB emphasized that "Sahd has been located on the line for many years, and has made extensive use of it for transportation service in connection with its business." Sahd last shipped over the line in 1988. In 1990, it received two carloads of machinery. Since then, the line has been dismantled and nothing remains of it except this 2.5 miles of track and the land on which it rests. Thus, Sahd has not used the line or any part of it for the past thirteen years. The STB noted that the value in this purchase was not the track, but in the fee simple title to the land.

## II.

The burden of proof in this dispute is on the offeror, Sahd. *Kulmer v. STB*, 236 F.3d 1255, 1256 (10th Cir.2001). Sahd had to show by credible evidence that: (1) the OFA was for continued rail use; (2) the offeror's projections of traffic were reasonable; and (3) the level of rail traffic pro-

---

1. Ronald Sahd stated that he approached Dillinger in the fall of 2000 and expressed a desire to purchase the corridor for rail use.

jected would be sufficient to sustain rail service. *Id.; Roaring Fork R.R. Holding Auth.—Abandonment Exemption —In Garfield, Eagle & Pitkin Counties*, STB dkt No. AB 547X, 1999 STB LEXIS 299, at *8 (STB May 21, 1999).

The Board acknowledged that this was the relevant standard, but departed from its own precedent in failing meaningfully to require Sahd to meet its burden of proof. The STB finding that the OFA was a bona fide effort to continue rail service was based only on bald, unsupported assertions. As to the second and third *Roaring Fork* requirements, the STB has no evidence whatsoever and M&H submitted a verified statement indicating that the hypothetical levels of use projected by Sahd would be insufficient to justify the restoration expenses.

In effect, the STB erroneously placed the burden on Shawnee and Columbia to prove that the OFA was *not* a bona fide effort to provide rail service. The STB required greater evidentiary support for Shawnee's assertions than for Sahd's. For example, Shawnee offered a list of costs to rehabilitate the line, including reconnecting the stub with the adjacent through track, reestablishing crossings at four streets, and reconditioning the line. Shawnee reasonably estimated these costs at $300,000. The STB rejected this estimate, stating that "Shawnee offers no support for its assertion that these costs will add up to $300,000." The STB recognized that Shawnee cited the Columbia Greenway Master Plan as its authority for the proposition that restoring service would be economically and institutionally infeasible, but the STB rejected this projection as a conclusion unsupported by analysis. On the other hand, the STB blindly accepted Sahd's less plausible calculations, although Sahd offered no underlying support other than his own self-serving statement.

Nor has Sahd furnished any convincing evidence that it has any use for rail service. It has not furnished any evidence whatsoever except for the self-serving statement of its president, Ronald G. Sahd. Ronald also states that rail service "will contribute to Sahd's continued financial success by allowing Sahd Salvage to reach mills throughout the United States and to follow market demand for scrap metal." This broad, wishful statement is not supported by a single affidavit or statement of any prospective customer.

In his unsupported statement, Ronald states that there are mills in the South, particularly in North Carolina and Virginia, that have "expressed an interest" in buying scrap metal from his company. Sahd names five mills, which he says are rail accessible, but in this hotly contested proceeding, he provides no supporting proof from any of them of an interest or intention to purchase Sahd's scrap metal. Sahd has not produced a single letter of interest from them, or a letter of intent or a contract to support an interest in purchasing scrap metal from Sahd. Not one of them has been deposed, and Ronald's statement has not been tested by cross-examination. At best, his statement is vague and highly speculative; at worst, it is fantasy. The Board has not a shred of information as to how much metal these mills would require on an annual basis, the foreseeable duration of their requirements from Sahd, and where and how they are obtaining scrap metal at the present time. Sahd has not even produced a supporting statement to show that they are rail accessible.

A close reading of *Roaring Fork* demonstrates that the STB was bound by its precedent to reject Sahd's offer. In *Roaring Fork*, the STB criticized the offeror's lack of tangible evidence that other providers were interested in using the line. The

offeror identified five potential Southern shippers but the STB found that three were not in a position to use the line and the traffic projections for the remaining two were "*too indefinite and insufficient to support continued rail service.*" Likewise, in the instant case, we have no information whatsoever from any of the five potential shippers mentioned in passing by Sahd as to what use a rail line will have for any of them, or of what their traffic projections might be.

Sahd did submit two letters from Anvil International, Inc., which it refers to as a potential shipper. However, these letters have scant evidentiary value. The first letter consists merely of several vague sentences:

> The utilization of rail as a delivery made for some type of raw material at several similar plants within our company, has demonstrated that it can be an effective method of transportation.

> In the event that we determine that this would be a favorable freight alternative for our plant, I believe that we could utilize three to fifteen rail cars per week.

This letter is innocuous, non-committal, and has no evidentiary value of transportation need. That rail "can be an effective method of transportation" is an obvious generalization that has no significance. Nothing in this vague letter makes any commitment; it merely expresses a possibility at some undetermined future time.

Sahd submitted a follow-up letter from Anvil dated August 8, 2001. This letter is almost as vague and indefinite as its first letter. It states that Sahd recently acquired a new product line at its Columbia facility, without stating what it is. It also states that rail delivery "has become more viable" and it is currently investigating ways to reduce its freight and traveling costs. It is a perfunctory, feeble statement; it furnishes no information as to whether it has a railroad siding, whether it has used the line in the past, or what its traffic requirements may be. Again, Anvil makes not the slightest commitment to use the line.

The experienced president of a railroad that formerly operated this very line, Wendell J. Dillinger, stated in his sworn statement that neither Sahd nor Anvil had committed themselves to ship over his line, and had "M&H Railroad/1411 felt there was serious interest in keeping the line running, no abandonment authorization would have been requested." Dillinger further stated that "Anvil has not contacted us since 1987." Dillinger's objectivity is beyond dispute. His company will receive the same amount of money whether the corridor is purchased by Sahd or Shawnee.

Likewise, Colonial Metals informed the STB by letter dated July 18, 2001, that it owns a twelve-acre site directly adjacent to the planned Shawnee Run Greenway. Colonial stated that "we see no realistic current rail need for the line." It expressed the view at the same time that it did not "anticipate that railbanking the line is necessary to keep this line available for reasonable future needs." Colonial, therefore, notified the Board that it had no objection to exempting this proceeding from further OFA procedures.

STB recognized that the failure of the line to carry any traffic in a decade "could support the argument that there is no call for continued rail service." STB relied, however, on Sahd's wishful statement that it desired to resume rail service, its previous attempts to buy the Line, and its unsupported potential for rail service. The Interstate Commerce Commission. STB's predecessor, held that "[t]hose situations in which a purchaser of rail properties has no affirmative plans for continuation or resumption of service, but merely holds out the possibility of continuation or

resumption of service at some unspecified future time, are not properly to be considered offers of financial assistance and do not fall within the scope of 49 U.S.C. 10905." *Abandonment of R.R. Lines & Discontinuance of Service, Ex Parte No. 274 (Sub–No. 6)*, 365 I.C.C. 249, 260 (I.C.C.1981).

Sahd may have used the line in the past, but not in the last thirteen years. Sahd may desire to resume using rail service but mere *desire* is not proof of feasibility, or a need for the service, or proof that there is sufficient traffic for a viable line, and that Sahd has the capability to operate a railroad. Sahd's unsupported wish is a feeble basis on which to reject important and bona fide local, county, and state plans for trails and open space.

## III.

The STB's failure to follow *Roaring Fork* requires reversal in this case. It is arbitrary and capricious for an agency to depart from its own precedent without reasoned explanation. *Donovan v. Adams Steel Erection, Inc.*, 766 F.2d 804, 807 (3d Cir.1985). The STB's decision is entitled to a presumption of regularity but "that presumption is not to shield [its] action from a thorough, probing, in-depth review." *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).[2] Scrutiny of the facts does not end with the determination that the STB has acted within the scope of its statutory authority. Rather,

the Administrative Procedure Act (A.P.A.) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).[3]

In making this finding, we consider whether the decision was based on "a consideration of the relevant factors" and "whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814. This Court's inquiry into the facts should be "searching and careful." *Id.* The majority acknowledges that the evidence supporting the STB decision is "manifestly[ ] modest." Maj. op. at 233–234. The evidence is not only modest, but so paltry, wishful, and speculative that the acceptance of its OFA was arbitrary and capricious.

The scope of review under the arbitrary and capricious standard is narrow. Although a court is not to substitute its judgment for that of the agency, "[n]evertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' " *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal citation omitted). The STB here has failed to provide a satisfactory explanation for accepting Sahd's OFA, particularly in light of the strong evidence to the contrary.

---

**2.** Arbitrary and capricious review is not always as deferential as the majority suggests. For example, in *Ethyl Corp. v. EPA*, 541 F.2d 1 (D.C.Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976), the majority and dissenting opinions collectively devoted thirty-eight pages to a detailed analysis of factual studies relied upon by an administrative agency.

**3.** Since the OFA statute makes no reference to a hearing on the record, this is an informal adjudication and no formal hearings are required. However, "in their application to the requirement of factual support the substantial evidence test and the arbitrary and capricious test are one and the same." *Ass'n of Data Processing v. Fed. Reserve*, 745 F.2d 677, 683 (D.C.Cir.1984); *accord Sevoian v. Ashcroft*, 290 F.3d 166, 174 (3d Cir.2002).

As the Supreme Court stated when it set aside an order of the Interstate Commerce Commission:

There are no findings and no analysis here to justify the choice made, no indication of the basis on which the Commission exercised its expert discretion. We are not prepared to and the Administrative Procedure Act will not permit us to accept such adjudicatory practice. Expert discretion is the lifeblood of the administrative process, but unless we make the requirements for administrative action strict and demanding, *expertise*, the strength of modern government, can become a monster which rules with no practical limits on its discretion.

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) (note and citations omitted) (emphasis in original).

The STB's judgment in this case has the effect of seriously obstructing the public interest. If the STB had followed its own precedent and required Sahd to prove all three of the *Roaring Fork* requirements, it would have been compelled to conclude that Sahd had not carried its burden. As it now stands, there is no evidence to suggest that the track will be used for the public benefit, either for environmental and recreational purposes or for continued rail service.

### IV.

Accordingly, I would reverse the Board's decision and grant the petition for review.