# UNITED STATES *v.* GETTYSBURG ELECTRIC RAILWAY COMPANY.

## SAME *v.* SAME.[1]

### ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

Nos. 599, 629. Argued January 8, 9, 1896.—Decided January 27, 1896.

An appropriation by Congress for continuing the work of surveying, locating, and preserving the lines of battle at Gettysburg, Pennsylvania, and for purchasing, opening, constructing, and improving avenues along the portions occupied by the various commands of the armies of the Potomac and Northern Virginia on that field, and for fencing the same; and for the purchase, at private sale or by condemnation, of such parcels of land as the Secretary of War may deem necessary for the sites of tablets, and for the construction of the said avenues; for determining the leading tactical positions and properly marking the same with tablets of batteries, regiments, brigades, divisions, corps, and other organizations, with reference to the study and correct understanding of the battle, each tablet bearing a brief historical legend, compiled without praise and without censure, is an appropriation for a public use, for which the United States may, in the exercise of its right of eminent domain, condemn and take the necessary lands of individuals and corporations, situated within that State, including lands occupied by a railroad company.

Any act of Congress which plainly and directly tends to enhance the respect and love of the citizen for the institutions of his country and to quicken and strengthen his motives to defend them, and which is germane to and intimately connected with and appropriate to the exercise of some one or all of the powers granted by Congress, must be valid, and the proposed use in this case comes within such description.

------

[1] The docket title of each of these cases was *United States v. A certain Tract of Land in Cumberland Township, Adams County, State of Pennsylvania.*

The mere fact that Congress limits the amount to be appropriated for such purpose does not render invalid the law providing for the taking of the land.

The quantity of land which should be taken for such a purpose is a legislative, and not a judicial, question.

When land of a railroad company is taken for such purpose, if the part taken by the government is essential to enable the railroad corporation to perform its functions, or if the value of the remaining property is impaired, such facts may enter into the question of the amount of the compensation to be awarded.

The court below can, before a new trial, authorize the allegation as to the decision by the Secretary of War upon the necessity of taking the land to be amended, if necessary.

THESE are two writs of error to the Circuit Court of the United States for the Eastern District of Pennsylvania. They involve the same questions.

By the act of Congress, approved August 1, 1888, c. 728, 25 Stat. 357, entitled "An act to authorize condemnation of land for sites of public buildings and for other purposes," it is provided: "That in every case in which the Secretary of the Treasury, or any other officer of the Government, has been or hereafter shall be authorized to procure real estate for the erection of a public building or for other public uses, he shall be and hereby is authorized to acquire the same for the United States by condemnation, under judicial process, whenever in his opinion it is necessary or advantageous to the Government to do so."

By the act of Congress, approved March 3, 1893, c. 208, 27 Stat. 572, 599, generally called the Sundry Civil Appropriation act, it was provided, among other things, as follows: "Monuments and Tablets at Gettysburg. For the purpose of preserving the lines of battle at Gettysburg, Pennsylvania, and for properly marking with tablets the positions occupied by the various commands of the armies of the Potomac and of Northern Virginia on that field, and for opening and improving avenues along the positions occupied by troops upon those lines, and for fencing the same, and for determining the leading tactical positions of batteries, regiments, brigades, divisions, corps and other organizations, with reference to the study and correct understanding of the battle, and to mark the same

with suitable tablets, each bearing a brief historical legend, compiled without praise and without censure, the sum of twenty-five thousand dollars, to be expended under the direction of the Secretary of War."

Subsequently to the passage of that act and on the 5th of June, 1894, 28 Stat. 584, a joint resolution of Congress was approved by the President, which, after reciting the passage of the act of 1893, and the appropriation of the sum of $25,000 thereby, contained the further recital that the sum of $50,000 was then under consideration by Congress as an additional appropriation for the same purposes, and that it had been recently decided by the United States court, sitting in Pennsylvania, that authority had not been distinctly given for the acquisition of such land as may be necessary to enable the War Department to execute the purposes declared in the act of 1893, and that there was imminent danger that portions of the battlefield might be irreparably defaced by the construction of a railroad over the same, thereby making impracticable the execution of the provisions of the act of March 3, 1893, it was, therefore, "*Resolved*, By the Senate and House of Representatives of the United States of America in Congress assembled, that the Secretary of War is authorized to acquire by purchase (or by condemnation) pursuant to the act of August first, eighteen hundred and eighty-eight, such lands, or interest in lands, upon or in the vicinity of said battlefield, as in the judgment of the Secretary of War may be necessary for the complete execution of the act of March third, eighteen hundred and ninety-three: *Provided*, That no obligation or liability upon the part of the government shall be incurred under this resolution, nor any expenditure made except out of the appropriations already made and to be made during the present session of this Congress." A further appropriation of $50,000 was made for this purpose by the act of August 18, 1894, c. 301, 28 Stat. 372, 405, the same session of Congress.

Acting under the authority of these various statutes and joint resolution, the United States District Attorney for the Eastern District of Pennsylvania, by direction of the Attorney

General, filed a petition in the name of the United States for the purpose of condemning certain lands therein described, for the objects mentioned in the acts of Congress.

The petition in the first case recited the foregoing facts, and also stated the inability to agree with the owners upon the price of the land desired, and asked for the appointment of a jury, according to the law of the State of Pennsylvania in such case provided.   The second section of the act of Congress, approved August 1, 1888, above mentioned, provides that the practice, pleadings, forms and modes of proceedings are to conform so far as may be to those existing at the time in like causes in the courts of record of the State within which such Circuit or District Courts are held.   The Gettysburg Electric Railway Company answered this petition, and set up the fact that it was a corporation existing under the laws of Pennsylvania, and that by virtue of its charter it had the power to build its road along a certain portion of the Gettysburg borough limits, described in the answer; that it had acquired as a part of a route of one of the branches of its road, and for the purpose of using the same as a part of its right of way, the tract of land particularly mentioned and described in the petition, and which is the subject of the condemnation proceedings. It alleged that the effect of the condemnation of the strip of ground would be to cut off a particular branch railway or extension belonging to it, and destroy its continuity and prevent its construction and operation.   The company further answered that the greater part of the appropriation of $25,000, under the act of March 3, 1893, had already been expended for the purposes stated therein, and that the balance remaining to the credit of the appropriation was less than $10,000. The electric railway company afterwards filed a further or amended answer, and therein set forth that the entire balance remaining unexpended of the appropriation of $25,000, under the act of March 3, 1893, and of $50,000, which had been appropriated by the act approved August 18, 1894, were covered by contracts already made under the authority of the Secretary of War, and that there was not in point of fact, at that time, any part of either appropriation available for the

purpose of paying any judgment which might be recovered by the company in these condemnation proceedings.

Evidence was given on the question of the value of the land to be taken, and on the fifth of November, 1894, the jury filed a report awarding the sum of $30,000 as the value of the land proposed to be taken in the first or main proceeding. The Gettysburg Electric Railway Company duly filed exceptions to the award, and on the same day appealed therefrom. The United States also appealed. The case was argued, and in April, 1895, an order was entered that the first and second exceptions filed by the defendant be sustained and that the petition of the United States be dismissed. Those two exceptions are as follows:

"1. The act of Congress approved August 1, 1888, provides for the acquisition of real estate by the United States by condemnation only for the erection of public buildings or for other public uses. It does not appear in the petition of Ellery P. Ingham, Esq., United States Attorney, that the Secretary of War has been authorized to procure the tract of land mentioned in the fifth paragraph thereof, belonging to the Gettysburg Electric Railway Company, for the erection of a public building or for other public uses. The purposes named for the expenditure of the appropriation in the act of Congress of March 3, 1893, are not such public uses as authorize the condemnation by the United States of the real estate of private persons."

"2. The purpose specified in the sixth paragraph of the said petition, namely, 'of preserving the lines of battle,' 'properly marking with tablets the positions occupied,' and. 'determining the leading tactical positions of batteries, regiments, brigades, divisions, corps and other organizations with reference to the study and correct understanding of the battle, and to mark the same with suitable tablets,' are none of them public uses or purposes, authorizing the condemnation by the United States of private property."

The second proceeding was taken for the purpose of condemning a certain other portion of land containing a little over two acres. There was no trial in that matter, but the

case was dismissed, under the motion made by the defendant to quash the proceedings, upon the same grounds stated in the main case.

The substance of the holding of the circuit judge was that the intended use of the land was not that kind of a public use for which the United States had the constitutional power to condemn land. The district judge dissented from that view and was of the opinion that the use was public, and that the United States had the power to condemn land for that purpose.

*Mr. Solicitor General* and *Mr. Attorney General* for the United States.

*Mr. Thomas Hart, Jr.,* for the Gettysburg Electric Railway Company. *Mr. Charles Heebner* was with him on the brief.

I. The purposes named in the act of March 3, 1893, are not public uses, and the United States are not authorized to condemn private property for them.

We concede that the United States have the right to take private property for certain public uses; but, on the other hand, it is well settled that this right cannot be exercised, within the limits of a State, for a purpose which is not incident to some power delegated to the General Government. *Kohl* v. *United States,* 91 U. S. 367; *Cherokee Nation* v. *Southern Kansas Railway,* 135 U. S. 641; *United States* v. *Fox,* 94 U. S. 315; *Van Brocklin* v. *Tennessee,* 117 U. S. 151; *Shoemaker* v. *United States,* 147 U. S. 282.

The question, therefore, for consideration is whether the four purposes named in the act of 1893, namely: the preservation of the lines of battle; the marking the positions occupied by the various commands; the opening and improving avenues; and the determination of the leading tactical positions, have such relation to the powers granted by the Constitution as to come within the above stated rule.

It is to be observed at the outset that the question of the publicity of the use is not at all determined and concluded by the fact that the sovereign itself is the medium of the exercise

of the power. Such a doctrine would simply put it in the power of the government to take for any purpose it chose. The inquiry must always be: What are the objects to be accomplished — not who are the instruments for attaining them. There would be no limitation on the taking of property by the United States if it were conclusively considered that a use was a public one merely because the property was taken directly into the possession of the government.

There is in the decisions a good deal of uncertainty and conflict as to the meaning of the words "public use," two different classes of views existing — one holding that there must be a use or right of use on the part of the public or some limited portion of it, the other holding that the words are equivalent to public benefit, utility, or advantage.

It must be remembered that the question is not, for what purposes may the power of eminent domain be properly exercised by a sovereign State in the absence of restriction. The Constitution provides that private property shall not be taken for public uses without just compensation. These words are a limitation, the same in effect as, "you shall not exercise this power except for public use." Numerous cases have so held. *Harvey* v. *Thomas*, 10 Watts, 63; *United States* v. *Jones*, 109 U. S. 513; *Twelfth Street Market Company's case*, 142 Penn. St. 580; *Palairet's Appeal*, 67 Penn. St. 479; *Keeling* v. *Griffin*, 56 Penn. St. 305; *West River Bridge Co.* v. *Dix*, 6 How. 507; *Memphis Freight Co.* v. *Memphis*, 4 Coldwell, 419; *Sholl* v. *German Coal Co.*, 118 Illinois, 427; *In re Niagara Falls & Whirlpool Railway*, 108 N. Y. 375.

There is a difference between the powers of the Federal government and the powers of a state government in acquiring land within that State by the exercise of the right of eminent domain. This difference is thus expressed in Cooley's Constitutional Limitations, 6th ed. page 645:

"As under the peculiar American system the protection and regulation of private rights, privileges and immunities in general belong to the state government, and those governments are expected to make provision for the conveniences and necessities which are usually provided for their citizens

through the exercise of the right of eminent domain, the right itself, it would seem, must pertain to those governments also, rather than to the Government of the Nation; and such has been the conclusion of the authorities. In the new territories, however, where the Government of the United States exercises sovereign authority, it possesses, as incident thereto, the right of eminent domain, which it may exercise directly or through the territorial government; but this right passes from the nation to the newly formed State whenever the latter is admitted into the Union. So far, however, as the General Government may deem it important to appropriate lands or other property for its own purposes, and to enable it to perform its functions — as must sometimes be necessary in the case of forts, lighthouses, military posts or roads and other conveniences and necessities of the Government — the General Government may still exercise the authority, as well within the States and within the Territory under its exclusive jurisdiction, and its right to do so may be supported by the same reasons which support the right in any case; that is to say, the absolute necessity that the means in the Government for performing its functions and perpetuating its existence should not be liable to be controlled or defeated by the want of consent of private parties, or of any other authority."

The adjudicated cases show the character of the use for which the right to take private property has been sustained. *Burt* v. *Merchants' Ins. Co.,* 106 Mass. 356, for a postoffice; *Kohl* v. *United States,* 91 U. S. 367, for United States Courts; *United States* v. *Jones,* 109 U. S. 513, to improve water communication between the Mississippi and Lake Michigan; *United States* v. *Great Falls Manuf. Co.,* 112 U. S. 645, for supplying Washington with water; *In re League Island,* 1 Brewster, 524, for a navy yard; *Gilmer* v. *Line Point,* 18 California, 229, for a fort; *Reddall* v. *Bryan,* 14 Maryland, 444, for water works for Washington; *Orr* v. *Quimby,* 54 N. H. 590; *United States* v. *Chicago,* 7 How. 185, for military purposes. See also Constitution, Art. I., Sec. 8; *Fort Leavenworth Railroad* v. *Lowe,* 114 U. S. 525.

The purposes specified. in the various acts of Congress authorizing or regulating the taking of private property for public use are national cemeteries, sites for life-saving stations, lighthouses, for improvement of rivers and harbors, for fortifications and coast defences, and Government Printing Office. The present case is none of these. To what authority in Congress is it germane ?

The provision for opening and improving avenues need not be considered. Congress has power to provide only for those highways, whether roads, bridges or railroads, which are intended as a means of communication between the States. *California* v. *Central Pacific Railroad,* 127 U. S. 1; *Cherokee Nation* v. *Southern Kansas Railway,* 135 U. S. 641; *Luxton* v. *North River Bridge Co.,* 153 U. S. 525; *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312.

When this case was argued in the court below the objects of the act of 1893 were referred by the learned United States Attorney to Art. I., Sec. 8, of the Constitution empowering Congress " to levy and collect taxes, duties, imports and excises, to pay the debts and provide for the common defence and general welfare of the United States."

It is quite sufficient, however, to say in the words of the opinion below, that the power to lay and collect taxes is quite distinct from the right to take private property for public use, and that it is not the power of taxation but the right of eminent domain which is here asserted.

This matter is to be looked at solely with reference to what the United States proposes to do by the terms of the act under which these proceedings are conducted.

The United States has not yet acquired any ground for a national park. The ground is already acquired, to a large extent, by the Gettysburg Battlefield Memorial Association, a corporation of the State of Pennsylvania, but its purposes and acts cannot be used.to help out the action of the United States in the proposed condemnation.

The government may purchase land and devote it to a great many purposes which it could not be contended would entitle it to condemn the same against the will of the owner.

When, however, it seeks to take private property it can and will be prevented from accomplishing that purpose if the object be not one which it has power to carry out.

It is by no means clear, however, that the United States may condemn land in a State for the purpose of a national park.

This question was argued and received some consideration in *Shoemaker* v. *United States*, 147 U. S. 282, but the decision was expressly rested upon the ground that the place of the exercise of the power was the District of Columbia, over which Congress has exclusive power of legislation.

II. The appropriation for the payment of the property taken being entirely inadequate, it is submitted that the proviso to the resolution of June 6, 1894, "that no obligation or liability upon the part of the government shall be incurred under this resolution, or any expenditure made except out of the appropriation already made and to be made during the present session of this Congress," renders the whole unconstitutional, nugatory, and void.

The first act of March 3, 1893, appropriated the sum of $25,000. The act of August 18, 1894, appropriated the sum of $50,000, and this is the total of the appropriations made during the session of Congress at which the resolution of June 6, 1894, was passed. See proviso thereto.

By the supplemental answers it appears that the balance to the credit of the first named appropriation was, February, 1895, $2882.17, and the balance to the credit of the other was, as of the same date, $36,000.

It further appears, however, by the answers filed March 20, 1895, that the entire balance remaining unexpended of both of the above mentioned appropriations is covered by contracts already made under the authority of the Secretary of War, for purposes for which the said appropriations were made, and that the execution of the said contracts will require the expenditure of the entire balances remaining of both appropriations.

The taking of land from a citizen for the use of the United States cannot be constitutional wi'hout a provision being

made for a tribunal for the ascertainment of compensation, and for a method by which payment can be enforced by such proper tribunal, or a pledge of public faith being made that a distinct fund should be held by the government for its payment.

The settled and fundamental doctrine is thus stated by Chancellor Kent, 2 Com., 12th ed., 339, note *f*: "The settled and fundamental doctrine is that government has no right to take private property for public purposes without giving a just compensation; and it seems to be necessarily implied that the indemnity should, in cases which will admit of it, be previously and equitably ascertained, and be ready for reception, concurrently in point of time with the actual exercise of the right of eminent domain." See also *Bloodgood* v. *Mohawk & Hudson River Railroad*, 18 Wend. 9; *People* v. *Hayden*, 6 Hill, 359; *Loweree* v. *Newark*, 38 N. J. Law, 151; *Connecticut River Railroad* v. *Commissioners*, 127 Mass. 50; *In re Sedgeley Avenue*, 88 Penn. St. 509; *Orr* v. *Quimby*, 54 N. H. 590; *Cherokee Nation* v. *Southern Kansas Railway*, 135 U. S. 641, 659; *United States* v. *Great Falls Mfg. Co.*, 112 U. S. 645.

In the present case, although the act of 1888 provides a method of ascertaining damages in cases of condemnation by the United States, there is no adequate fund provided for the payment thereof. Upon an ascertainment in the condemnation proceedings of the damage to the Electric Railway Company, it will have to await the pleasure of Congress before it can obtain payment.

III. The act of Congress does not authorize the acquisition of a railway in actual operation.

The law is settled that only an intention in express terms or shown to exist by necessary implication, will sustain the taking of property already devoted to a public use. General terms such as "land," etc., are not sufficient.

In *West River Bridge Co.* v. *Dix*, 6 How. 507, Justice Woodbury said, page 543, that the right to take a franchise was subject to the limitation "that it must be in cases where a clear intent is manifested in the laws, that one corporation and its uses shall yield to another, or another public use under

the supposed superiority of the latter and the necessity of the case."

It must be admitted that in the act of 1893 there is no expression of an intent to take this railway, or any part of it. The government knew of the situation when the act of 1893 was passed. This company had acquired this strip for the purpose of constructing its railway in 1891. The deeds were recorded in February and November, 1892. The United States could have taken the railroad, but it then said nothing on the subject.

IV. A part only of the franchise of a railroad company cannot be condemned and taken. The franchise is indivisible.

MR. JUSTICE PECKHAM, after stating the case, delivered the opinion of the court.

The really important question to be determined in these proceedings is, whether the use to which the petitioner desires to put the land described in the petitions is of that kind of public use for which the government of the United States is authorized to condemn land.

It has authority to do so whenever it is necessary or appropriate to use the land in the execution of any of the powers granted to it by the Constitution. *Kohl* v. *United States,* 91 U. S. 367; *Cherokee Nation* v. *Kansas Railway,* 135 U. S. 641, 656; *Chappell* v. *United States,* 160 U. S. 499.

Is the proposed use, to which this land is to be put, a public use within this limitation?

The purpose of the use is stated in the first act of Congress, passed on the 3d day of March, 1893, (the appropriation act of 1893,) and is quoted in the above statement of facts. The appropriation act of August 18, 1894, also contained the following: "For continuing the work of surveying, locating and preserving the lines of battle at Gettysburg, Pennsylvania, and for purchasing, opening, constructing and improving avenues along the portions occupied by the various commands of the armies of the Potomac and Northern Virginia on that field, and for fencing the same; and for the purchase, at private sale or by condemnation, of such parcels of land as the Sec-

retary of War may deem necessary for the sites of tablets, and for the construction of the said avenues; for determining the leading tactical positions and properly marking the same with tablets of batteries, regiments, brigades, divisions, corps and other organizations with reference to the study and correct understanding of the battle, each tablet bearing a brief historical legend, compiled without praise and without censure; fifty thousand dollars, to be expended under the direction of the Secretary of War."

In these acts of Congress and in the joint resolution the intended use of this land is plainly set forth. It is stated in the second volume of Judge Dillon's work on Municipal Corporations, (4th ed. § 600,) that when the legislature has declared the use or purpose to be a public one, its judgment will be respected by the courts, unless the use be palpably without reasonable foundation. Many authorities are cited in the note, and, indeed, the rule commends itself as a rational and proper one.

As just compensation, which is the full value of the property taken, is to be paid, and the amount must be raised by taxation where the land is taken by the government itself, there is not much ground to fear any abuse of the power. The responsibility of Congress to the people will generally, if not always, result in a most conservative exercise of the right. It is quite a different view of the question which courts will take when this power is delegated to a private corporation. In that case the presumption that the intended use for which the corporation proposes to take the land is public, is not so strong as where the government intends to use the land itself.

In examining an act of Congress it has been frequently said that every intendment is in favor of its constitutionality. Such act is presumed to be valid unless its invalidity is plain and apparent; no presumption of invalidity can be indulged in; it must be shown clearly and unmistakably. This rule has been stated and followed by this court from the foundation of the government.

Upon the question whether the proposed use of this land is a public one, we think there can be no well founded doubt.

And also, in our judgment, the government has the constitutional power to condemn the land for the proposed use. It is, of course, not necessary that the power of condemnation for such purpose be expressly given by the Constitution. The right to condemn at all is not so given. It results from the powers that are given, and it is implied because of its necessity, or because it is appropriate in exercising those powers. Congress has power to declare war and to create and equip armies and navies. It has the great power of taxation to be exercised for the common defence and general welfare. Having such powers, it has such other and implied ones as are necessary and appropriate for the purpose of carrying the powers expressly given into effect. Any act of Congress which plainly and directly tends to enhance the respect and love of the citizen for the institutions of his country and to quicken and strengthen his motives to defend them, and which is germane to and intimately connected with and appropriate to the exercise of some one or all of the powers granted by Congress must be valid. This proposed use comes within such description. The provision comes within the rule laid down by Chief Justice Marshall, in *McCulloch* v. *Maryland*, 4 Wheat. 316, 421, in these words : " Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adequate to that end, which are not prohibited but consist with the letter and spirit of the Constitution, are constitutional."

The end to be attained by this proposed use, as provided for by the act of Congress, is legitimate, and lies within the scope of the Constitution. The battle of Gettysburg was one of the great battles of the world. The numbers contained in the opposing armies were great ; the sacrifice of life was dreadful ; while the bravery and, indeed, heroism displayed by both the contending forces rank with the highest exhibition of those qualities ever made by man. The importance of the issue involved in the contest of which this great battle was a part cannot be overestimated. The existence of the government itself and the perpetuity of our institutions depended upon the result. Valuable lessons in the art of war can now be learned

from an examination of this great battlefield in connection with the history of the events which there took place. Can it be that the government is without power to preserve the land, and properly mark out the various sites upon which this struggle took place? Can it not erect the monuments provided for by these acts of Congress, or even take possession of the field of battle in the name and for the benefit of all the citizens of the country for the present and for the future? Such a use seems necessarily not only a public use, but one so closely connected with the welfare of the republic itself as to be within the powers granted Congress by the Constitution for the purpose of protecting and preserving the whole country. It would be a great object lesson to all who looked upon the land thus cared for, and it would show a proper recognition of the great things that were done there on those momentous days. By this use the government manifests for the benefit of all its citizens the value put upon the services and exertions of the citizen soldiers of that period. Their successful effort to preserve the integrity and solidarity of the great republic of modern times is forcibly impressed upon every one who looks over the field. The value of the sacrifices then freely made is rendered plainer and more durable by the fact that the government of the United States, through its representatives in Congress assembled, appreciates and endeavors to perpetuate it by this most suitable recognition. Such action on the part of Congress touches the heart, and comes home to the imagination of every citizen, and greatly tends to enhance his love and respect for those institutions for which these heroic sacrifices were made. The greater the love of the citizen for the institutions of his country the greater is the dependence properly to be placed upon him for their defence in time of necessity, and it is to such men that the country must look for its safety. The institutions of our country which were saved at this enormous expenditure of life and property ought to and will be regarded with proportionate affection. Here upon this battlefield is one of the proofs of that expenditure, and the sacrifices are rendered more obvious and more easily appreciated when such a battlefield is preserved by the government

at the public expense. The right to take land for cemeteries for the burial of the deceased soldiers of the country rests on the same footing and is connected with and springs from the same powers of the Constitution. It seems very clear that the government has the right to bury its own soldiers and to see to it that their graves shall not remain unknown or unhonored.

No narrow view of the character of this proposed use should be taken. Its national character and importance, we think, are plain. The power to condemn for this purpose need not be plainly and unmistakably deduced from any one of the particularly specified powers. Any number of those powers may be grouped together, and an inference from them all may be drawn that the power claimed has been conferred.

It is needless to enlarge upon the subject, and the determination is arrived at without hesitation that the use intended as set forth in the petition in this proceeding is of that public nature which comes within the constitutional power of Congress to provide for by the condemnation of land.

*Second.* It is objected that the appropriations made by the several acts of Congress had been exhausted when the amended answers were put in, and that the proviso attached to the joint resolution above mentioned, prohibiting any expenditure other than such as might be appropriated in that session of Congress, renders it impossible for the land owner to obtain payment with any certainty for his property that might be taken from him. Although it is set up in the answer of the electric company to the petition filed on the part of the United States, the fact that the fund appropriated has been exhausted does not appear by any evidence contained in either record. So far as this court can see from the record, there is an appropriation amounting to $75,000, for the purpose of obtaining land, a part of which has been found to be worth $30,000, and the other, and much smaller portion, is not valued. The proviso, therefore, would seem to be immaterial, as the appropriations were much larger than the value of the land to be taken. The mere fact that Congress limited the amount to be appropriated for the purposes indicated does not

render the law providing for the taking· of the land invalid. *Shoemaker* v. *United States*, 147 U. S. 282, 302. Mr. Justice Shiras, in delivering the opinion of the court in the case cited, said : " The validity of the law is further challenged · because the aggregate amount to be expended in the purchase of land for the park is limited to the amount of $1,200,000. It is said that this is equivalent to condemning the lands and fixing their value by arbitrary enactment. But a glance at the act shows that the property holders are not affected by the limitation. The value of the land is to be agreed upon, or, in the absence of agreement, is to be found by appraisers to be appointed by the court. The intention expressed by Congress, not to go beyond a certain expenditure, cannot be deemed a direction to the appraisers to keep within any given limit in valuing any particular piece of property. It is not unusual for Congress, in making appropriations for the erection of public buildings, including the purchase of sites, to name a sum beyond which expenditure shall not be made, but nobody ever thought that such a limitation had anything to do with what the owners of property should have a right to receive in case proceedings to condemn had to be resorted to." If it appeared by proof that the appropriation for the purpose indicated had been exhausted before the proceedings had been commenced to take the land in controversy, or during the hearing, then the provision in the joint resolution directing that no obligation or liability upon the part of the government should be incurred or any expenditure made except out of the appropriations already made and to be made during the then session of Congress, would give rise to a very serious question. It is not now presented. Congress has the power, even now, to appropriate moneys for this purpose in addition to that which it appropriated in the two acts of 1893 and 1894. This court cannot, therefore, upon the record as it stands give judgment for the land owner on the ground that the appropriation for the land has been exhausted in other ways, and that Congress prohibited the incurring of any obligation to a greater extent than the moneys then appropriated.

*Third.* Another objection taken in the court below, though

not decided by that court, but which counsel for defendant in error now urges as an additional ground for the affirmance of the judgment, is that the land proposed to be taken in this proceeding was already devoted to another public use, to wit, that of the railroad company, and that it does not appear that it was the intention of Congress to take land which was devoted to another public use. The defendant in error concedes what is without doubt true, that this is a question of intention simply; the power of Congress to take land devoted to one public use for another and a different public use upon making just compensation cannot be disputed. Upon looking at the two acts of Congress and the joint resolution of June 6, 1894, above referred to, in the latter of which it is stated, "There is imminent danger that portions of said battlefield may be irreparably defaced by the construction of a railway over the same, thereby making impracticable the execution of the provisions of the act of March 3, 1893," we think it is plainly apparent that Congress did intend to take this very land, occupied and used by this company for its railroad.

Further elaboration is unnecessary. It is so plain to our minds that extended argument would be unprofitable.

*Fourth.* It is also objected that the exception below is valid, wherein it is stated that all the land of the railroad company ought to be taken, if any were to be taken. The use for which the land is to be taken having been determined to be a public use, the quantity which should be taken is a legislative and not a judicial question. *Shoemaker* v. *United States,* 147 U. S. 282, 298. As to the effect of the taking upon the land remaining, that is more a question of the amount of compensation. If the part taken by the government is essential to enable the railroad corporation to perform its functions, or if the value of the remaining property is impaired, such facts might enter into the question of the amount of the compensation to be awarded. *Monongahela Nav. Co.* v. *United States,* 148 U. S. 312, 333, 334.

*Fifth.* It is also objected that the petition does not allege that the Secretary of War has decided it to be necessary to take this land. A perusal of the petition shows that the

allegation therein contained upon this subject is not very clear. It might possibly be regarded as sufficiently alleged in an argumentative kind of way, but it certainly is not as plainly alleged as it ought to be. The petition, however, can be easily amended on application to the court below before further proceedings are taken.

This, we think, completes the review of the material questions presented by the record. The first and important question in regard to whether the proposed use is public or not, having been determined in favor of the United States, we are not disposed to take any very technical view of the other questions which might be subject to amendment or to further proof upon the hearing below.

*The judgment of the Circuit Court in each case must be reversed, and the record remitted to that court with directions to grant a new trial in each.*