Justice Thomas,
dissenting.
Long ago, William Blackstone wrote that “the law of the land . .. postponed] even public necessity to the sacred and inviolable rights of private property.” 1 Commentaries on the Laws of England 134-135 (1765) (hereinafter Blackstone). The Framers embodied that principle in the Constitution, allowing the government to take property not for “public necessity,” but instead for “public use.” Arndt. 5. *506 Defying this understanding, the Court replaces the Public Use Clause with a “ ‘[PJublie [Pjurpose’” Clause, ante, at 479-480 (or perhaps the “Diverse and Always Evolving Needs of Society” Clause, ante, at 479 (capitalization added)), a restriction that is satisfied, the Court instructs, so long as the purpose is “legitimate” and the means “not irrational,” ante, at 488 (internal quotation marks omitted). This deferential shift in phraseology enables the Court to hold, against all common sense, that a costly urban-renewal project whose stated purpose is a vague promise of new jobs and increased tax revenue, but which is also suspiciously agreeable to the Pfizer Corporation, is for a “public use.”
I cannot agree. If such “economic development” takings are for a “public use,” any taking is, and the Court has erased the Public Use Clause from our Constitution, as Justice O’Connor powerfully argues in dissent. Ante, at 494, 501-505. I do not believe that this Court can eliminate liberties expressly enumerated in the Constitution and therefore join her dissenting opinion. Regrettably, however, the Court’s error runs deeper than this. Today’s decision is simply the latest in a string of our eases construing the Public Use Clause to be a virtual nullity, without the slightest nod to its original meaning. In my view, the Public Use Clause, originally understood, is a meaningful limit on the government’s eminent domain power. Our cases have strayed from the Clause’s original meaning, and I would reconsider them.
I
The Fifth Amendment provides:
“No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb, nor shall be compelled in any *507 criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property he taken for public use, without just compensation.” (Emphasis added.)
It is the last of these liberties, the Takings Clause, that is at issue in this case. In my view, it is “imperative that the Court maintain absolute fidelity to” the Clause’s express limit on the power of the government over the individual, no less than with every other liberty expressly enumerated in the Fifth Amendment or the Bill of Rights more generally. Shepard v. United States, 544 U. S. 13, 28 (2005) (Thomas, J., concurring in part and concurring in judgment) (internal quotation marks omitted).
Though one component of the protection provided by the Takings Clause is that the government can take private property only if it provides “just compensation” for the taking, the Takings Clause also prohibits the government from taking property except “for public use.” Were it otherwise, the Takings Clause would either be meaningless or empty. If the Public Use Clause served no function other than to state that the government may take property through its eminent domain power — for public or private uses — then it would be surplusage. See ante, at 496 (O’Connor, J., dissenting); see also Marbury v. Madison, 1 Cranch 137, 174 (1803) (“It cannot be presumed that any clause in the constitution is intended to be without effect”); Myers v. United States, 272 U. S. 52, 151 (1926). Alternatively, the Clause could distinguish those takings that require compensation from those that do not. That interpretation, however, “would permit private property to be taken or appropriated for private use without any compensation whatever.” Cole v. La Grange, 113 U. S. 1, 8 (1885) (interpreting same language in the Missouri Public Use Clause). In other words, the Clause would require the government to compensate for takings done “for public use,” leaving it free to take property for purely private uses without the payment of compensa *508 tion. This would contradict a bedrock principle well established by the time of the founding: that all takings required the payment of compensation. 1 Blackstone 135; 2 J. Kent, Commentaries on American Law 275 (1827) (hereinafter Kent); For the National Gazette, Property (Mar. 27,1792), in 14 Papers of James Madison 266, 267 (R. Rutland et al. eds. 1983) (arguing that no property “shall be taken directly even for public use without indemnification to the owner”).[1] The Public Use Clause, like the Just Compensation Clause, is therefore an express limit on the government’s power of eminent domain.
The most natural reading of the Clause is that it allows the government to take property only if the government owns, or the public has a legal right to use, the property, as opposed to taking it for any public purpose or necessity whatsoever. At the time of the founding, dictionaries primarily defined the noun “use” as “[t]he act of employing any thing to any purpose.” 2 S. Johnson, A Dictionary of the English Language 2194 (4th ed. 1773) (hereinafter Johnson). The term “use,” moreover, “is from the Latin utor, which means ‘to use, make use of, avail one’s self of, employ, apply, enjoy, etc.” J. Lewis, Law of Eminent Domain § 165, p. 224, n. 4 (1888) (hereinafter Lewis). When the government takes property and gives it to a private individual, and the public has no right to use the property, it strains language to say that the public is “employing” the property, regardless of the incidental benefits that might accrue to the public from the private use. The term “public use,” then, means that either the government or its citizens as a whole must actu *509 ally “employ” the taken property. See id., at 223 (reviewing founding-era dictionaries).
Granted, another sense of the word “use” was broader in meaning, extending to “[cjonvenience” or “help,” or “[qualities that make a thing proper for any purpose.” 2 Johnson 2194. Nevertheless, read in context, the term “public use” possesses the narrower meaning. Elsewhere, the Constitution twice employs the word “use,” both times in its narrower sense. Claeys, Public-Use Limitations and Natural Property Rights, 2004 Mich. St. L. Rev. 877,897 (hereinafter Public Use Limitations). Article I, § 10, provides that “the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States,” meaning the Treasury itself will control the taxes, not use it to any beneficial end. And Article I, §8, grants Congress power “[t]o raise and support Armies, but no Appropriation of Money to that Use shall be for a longer Term than two Years.” Here again, “use” means “employed to raise and support Armies,” not anything directed to achieving any military end. The same word in the Public Use Clause should be interpreted to have the same meaning.
Tellingly, the phrase “public use” contrasts with the very different phrase “general Welfare” used elsewhere in the Constitution. See ibid. (“Congress shall have Power To . . . provide for the common Defence and general Welfare of the United States”); preamble (Constitution established “to promote the general Welfare”). The Framers would have used some such broader term if they had meant the Public Use Clause to have a similarly sweeping scope. Other founding-era documents made the contrast between these two usages still more explicit. See Sales, Classical Republicanism and the Fifth Amendment’s “Public Use” Requirement, 49 Duke L. J. 339, 367-368 (1999) (hereinafter Sales) (noting contrast between, on the one hand, the term “public use” used by 6 of the first 13 States and, on the other, *510 the terms “public exigencies” employed in the Massachusetts Bill of Rights and the Northwest Ordinance, and the term “public necessity” used in the Vermont Constitution of 1786). The Constitution’s text, in short, suggests that the Takings Clause authorizes the taking of property only if the public has a right to employ it,.not if the public realizes any conceivable benefit from the taking.
The Constitution’s common-law background reinforces this understanding. The common law provided an express method of eliminating uses of land that adversely impacted the public welfare: nuisance law. Blackstone and Kent, for instance, both carefully distinguished the law of nuisance from the power of eminent domain. Compare 1 Blackstone 135 (noting government’s power to take private property with compensation) with 3 id., at 216 (noting action to remedy “public . . . nuisances, which affect the public, and are an annoyance to all the king’s subjects”); see also 2 Kent 274-276 (distinguishing the two). Blackstone rejected the idea that private property could be taken solely for purposes of any public benefit. “So great... is the regard of the law for private property,” he explained, “that it will not authorize the least violation of it; no, not even for the general good of the whole community.” 1 Blackstone 135. He continued: “If a new road .. . were to be made through the grounds of a private person, it might perhaps be extensively beneficial to the public; but the law permits no man, or set of men, to do this without the consent of the owner of the land.” Ibid. Only “by giving [the landowner] full indemnification” could the government take property, and even then “[t]he public [was] now considered as an individual, treating with an individual for an exchange.” Ibid. When the public took property, in other words, it took it as an individual buying property from another typically would: for one’s own use. The Public Use Clause, in short, embodied the Framers’ understanding that property is a natural, fundamental right, prohibiting the government from “tak[ing] property from A. and *511 giv[ing] it to B.” Calder v. Bull, 3 Dall. 386, 388 (1798); see also Wilkinson v. Leland, 2 Pet. 627, 658 (1829); Vanhorne’s Lessee v. Dorrance, 2 Dall. 304, 311 (CC Pa. 1795).
The public purpose interpretation of the Public Use Clause also unnecessarily duplicates a similar inquiry required by the Necessary and Proper Clause. The Takings Clause is a prohibition, not a grant of power: The Constitution does not expressly grant the Federal Government the power to take property for any public purpose whatsoever. Instead, the Government may take property only when necessary and proper to the exercise of an expressly enumerated power. See Kohl v. United States, 91 U. S. 367, 371-372 (1876) (noting Federal Government’s power under the Necessary and Proper Clause to take property “needed for forts, armories, and arsenals, for navy-yards and light-houses, for customhouses, post-offices, and court-houses, and for other public uses”). For a iaw to be within the Necessary and Proper Clause, as I have elsewhere explained, it must bear an “obvious, simple, and direct relation” to an exercise of Congress’ enumerated powers, Sabri v. United States, 541 U. S. 600, 613 (2004) (Thomas, J., concurring in judgment), and it must not “subvert basic principles of” constitutional design, Gonzales v. Raich, ante, at 65 (Thomas, J., dissenting). In other words, a taking is permissible under the Necessary and Proper Clause only if it serves a valid public purpose. Interpreting the Public Use Clause likewise to limit the government to take property only for sufficiently public purposes replicates this inquiry. If this is all the Clause means, it is, once again, surplusage. See supra, at 507. The Clause is thus most naturally read to concern whether the property is used by the public or the government, not whether the purpose of the taking is legitimately public.
II
Early American eminent domain practice largely bears out this understanding of the Public Use Clause. This practice *512 concerns state limits on eminent domain power, not the Fifth Amendment, since it was not until the late 19th century that the Federal Government began to use the power of eminent domain, and since the Takings Clause did not even arguably limit state power until after the passage of the Fourteenth Amendment. See Note, The Public Use Limitation on Eminent Domain: An Advance Requiem, 58 Yale L. J. 599, 599-600, and nn. 3-4 (1949); Barron ex rel. Tiernan v. Mayor of Baltimore, 7 Pet. 243, 250-251 (1833) (holding the Takings Clause inapplicable to the States of its own force). Nevertheless, several early state constitutions at the time of the founding likewise limited the power of eminent domain to “public uses.” See Sales 367-369, and n. 137 (emphasis deleted). Their practices therefore shed light on the original meaning of the same words contained in the Public Use Clause.
States employed the eminent domain power to provide quintessential^ public goods, such as public roads, toll roads, ferries, canals, railroads, and public parks. Lewis §§166, 168-171, 175, at 227-228, 234-241, 243. Though use of the eminent domain power was sparse at the time of the founding, many States did have so-called Mill Acts, which authorized the owners of grist mills operated by water power to flood upstream lands with the payment of compensation to the upstream landowner. See, e.g., id., §178, at 245-246; Head v. Amoskeag Mfg. Co., 113 U. S. 9, 16-19, and n. (1885). Those early grist mills “were regulated by law and compelled to serve the public for a stipulated toll and in regular order,” and therefore were actually used by the public. Lewis § 178, at 246, and n. 3; see also Head, supra, at 18-19. They were common carriers — quasi-public entities. These were “public uses” in the fullest sense of the word, because the public could legally use and benefit from them equally. See Public Use Limitations 903 (common-carrier status traditionally afforded to “private beneficiaries of a state fran *513 chise or another form of state monopoly, or to companies that operated in conditions of natural monopoly”).
To be sure, some early state legislatures tested the limits of their state-law eminent domain power. Some States enacted statutes allowing the taking of property for the purpose of building private roads. See Lewis §167, at 230. These statutes were mixed; some required the private landowner to keep the road open to the public, and others did not. See id., § 167, at 230-234. Later in the 19th century, moreover, the Mill Acts were employed to grant rights to private manufacturing plants, in addition to grist mills that had common-carrier duties. See, e.g., M. Horwitz, The Transformation of American Law 1780-1860, pp. 51-52 (1977).
These early uses of the eminent domain power are often cited as evidence for the broad "public purpose” interpretation of the Public Use Clause, see, e.g., ante, at 479-480, n. 8 (majority opinion); Brief for Respondents 30; Brief for American Planning Assn, et al. as Amici Curiae 6-7, but in fact the constitutionality of these exercises of eminent domain power under state public use restrictions was a hotly contested question in state courts throughout the 19th and into the 20th century. Some courts construed those clauses to authorize takings for public purposes, but others adhered to the natural meaning of “public use.”[2] As noted above, *514 the earliest Mill Acts were applied to entities with duties to remain open to the public, and their later extension is not deeply probative of whether that subsequent practice is consistent with the original meaning of the Public Use Clause. See McIntyre v. Ohio Elections Comm’n, 514 U. S. 334, 370 (1995) (Thomas, J., concurring in judgment). At the time of the founding, “[bjusiness corporations were only beginning to upset the old corporate model, in which the raison d’etre of chartered associations was their service to the public,” Horwitz, supra, at 49-50, so it was natural to those who framed the first Public Use Clauses to think of mills as inherently public entities. The disagreement among state courts, and state legislatures’ attempts to circumvent public use limits on their eminent domain power, cannot obscure that the Public Use Clause is most naturally read to authorize takings for public use only if the government or the public actually uses the taken property.
Ill
Our current Public Use Clause jurisprudence, as the Court notes, has rejected this natural reading of the Clause. Ante, at 479-483. The Court adopted its modern reading blindly, with little discussion of the Clause’s history and original meaning, in two distinct lines of cases: first, in cases adopting the “public purpose” interpretation of the Clause, and second, in cases deferring to legislatures’ judgments regarding what constitutes a valid public purpose. Those questionable cases converged in the boundlessly broad and deferential *515 conception of “public use” adopted by this Court in Berman v. Parker, 348 U. S. 26 (1954), and Hawaii Housing Authority v. Midkiff, 467 U. S. 229 (1984), cases that take center stage in the Court’s opinion. See ante, at 480-482. The weakness of those two lines of cases, and consequently Berman and Midkiff, fatally undermines the doctrinal foundations of the Court’s decision. Today’s questionable application of these cases is further proof that the “public purpose” standard is not susceptible of principled application. This Court’s reliance by rote on this standard is ill advised and should be reconsidered.
A
As the Court notes, the “public purpose” interpretation of the Public Use Clause stems from Fallbrook Irrigation Dist. v. Bradley, 164 U. S. 112, 161-162 (1896). Ante, at 479-480. The issue in Bradley was whether a condemnation for purposes of constructing an irrigation ditch was for a public use. 164 U. S., at 161. This was a public use, Justice Peckham declared for the Court, because “[t]o irrigate and thus to bring into possible cultivation these large masses of otherwise worthless lands would seem to be a public purpose and a matter of public interest, not confined to landowners, or even to any one section of the State.” Ibid. That broad statement was dictum, for the law under review also provided that “[a]ll landowners in the district have the right to a proportionate share of the water.” Id., at 162. Thus, the “public” did have the right to use the irrigation ditch because all similarly situated members of the public — those who owned lands irrigated by the ditch — had a right to use it. The Court cited no authority for its dictum, and did not discuss either the Public Use Clause’s original meaning or the numerous authorities that had adopted the “actual use” test (though it at least acknowledged the conflict of authority in state courts, see id., at 158; supra, at 513-514, and n. 2). Instead, the Court reasoned that “[t]he use must be regarded as a public use, or else it would seem to follow that no gen *516 eral scheme of irrigation can be formed or carried into effect.” Bradley, supra, at 160-161. This is no statement of constitutional principle: Whatever the utility of irrigation districts or the merits of the Court’s view that another rule would be “impractical given the diverse and always evolving needs of society,” ante, at 479, the Constitution does not embody those policy preferences any more than it “enact[s] Mr. Herbert Spencer’s Social Statics,” Lochner v. New York, 198 U. S. 45, 75 (1905) (Holmes, J., dissenting); but see id., at 58-62 (Peckham, J., for the Court).
This Court’s cases followed Bradley's test with little analysis. In Clark v. Nash, 198 U. S. 361 (1905) (Peckham, J., for the Court), this Court relied on little more than a citation to Bradley in upholding another condemnation for the purpose of laying an irrigation ditch. 198 U. S., at 369-370. As in Bradley, use of the “public purpose” test was unnecessary to the result the Court reached. The government condemned the irrigation ditch for the purpose of ensuring access to water in which “[o]ther land owners adjoining the defendant in error . . . might share,” 198 U. S., at 370, and therefore Clark also involved a condemnation for the purpose of ensuring access to a resource to which similarly situated members of the public had a legal right of access. Likewise, in Strickley v. Highland Boy Gold Mining Co., 200 U. S. 527 (1906), the Court upheld a condemnation establishing an aerial right-of-way for a bucket line operated by a mining company, relying on little more than Clark, see Strickley, supra, at 531. This case, too, could have been disposed of on the narrower ground that “the plaintiff [was] a carrier for itself and others,” 200 U. S., at 531-532, and therefore that the bucket line was legally open to the public. Instead, the Court unnecessarily rested its decision on the “inadequacy of use by the general public as a universal test.” Id., at 531. This Court’s cases quickly incorporated the public purpose standard set forth in Clark and Strickley by barren citation. See, *517 e. g., Rindge Co. v. County of Los Angeles, 262 U. S. 700, 707 (1923); Block v. Hirsh, 256 U. S. 135, 155 (1921); Mt. Vernon-Woodberry Cotton Duck Co. v. Alabama Interstate Power Co., 240 U. S. 30, 32 (1916); O’Neill v. Learner, 239 U. S. 244, 253 (1915).
B
A second line of this Court’s cases also deviated from the Public Use Clause’s original meaning by allowing legislatures to define the scope of valid “public uses.” United States v. Gettysburg Electric R. Co., 160 U. S. 668 (1896), involved the question whether Congress’ decision to condemn certain private land for the purpose of building battlefield memorials at Gettysburg, Pennsylvania, was for a public use. Id., at 679-680. Since the Federal Government was to use the lands in question, id., at 682, there is no doubt that it was a public use under any reasonable standard. Nonetheless, the Court, speaking through Justice Peckham, declared that “when the legislature has declared the use or purpose to be a public one, its judgment will be respected by the courts, unless the use be palpably without reasonable foundation.” Id., at 680. As it had with the “public purpose” dictum in Bradley, the Court quickly incorporated this dictum into its Public Use Clause eases with little discussion. See, e. g., United States ex rel. TVA v. Welch, 327 U. S. 546, 552 (1946); Old Dominion Land Co. v. United States, 269 U. S. 55, 66 (1925).
There is no justification, however, for affording almost insurmountable deference to legislative conclusions that a use serves a “public use.” To begin with, a court owes no deference to a legislature’s judgment concerning the quintessentially legal question of whether the government owns, or the public has a legal right to use, the taken property. Even under the “public purpose” interpretation, moreover, it is most implausible that the Framers intended to defer to legislatures as to what satisfies the Public Use Clause, uniquely *518 among all the express provisions of the Bill of Rights. We would not defer to a legislature’s determination of the various circumstances that establish, for example, when a search of a home would be reasonable, see, e.g., Payton v. New York, 445 U. S. 573, 589-590 (1980), or when a convicted double-murderer may be shackled during a sentencing proceeding without on-the-record findings, see Deck v. Missouri, 544 U. S. 622 (2005), or when state law creates a property interest protected by the Due Process Clause, see, e. g., Castle Rock v. Gonzales, post, at 756-758; Board of Regents of State Colleges v. Roth, 408 U. S. 564, 576 (1972); Goldberg v. Kelly, 397 U. S. 254, 262-263 (1970).
Still worse, it is backwards to adopt a searching standard of constitutional review for nontraditional property interests, such as welfare benefits, see, e.g., Goldberg, supra, while deferring to the legislature’s determination as to what constitutes a public use when it exercises the power of eminent domain, and thereby invades individuals’ traditional rights in real property. The Court has elsewhere recognized “the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic,” Payton, supra, at 601, when the issue is only whether the government may search a home. Yet today the Court tells us that we are not to “second-guess the City’s considered judgments,” ante, at 488, when the issue is, instead, whether the government may take the infinitely more intrusive step of tearing down petitioners’ homes. Something has gone seriously awry with this Court’s interpretation of the Constitution. Though citizens are safe from the government in their homes, the homes themselves are not. Once one accepts, as the Court at least nominally does, ante, at 477, that the Public Use Clause is a limit on the eminent domain power of the Federal Government and the States, there is no justification for the almost complete deference it grants to legislatures as to what satisfies it.
*519 C
These two misguided lines of precedent converged in Berman v. Parker, 348 U. S. 26 (1964), and Hawaii Housing Authority v. Midkiff, 467 U. S. 229 (1984). Relying on those lines of cases, the Court in Berman and Midkiff upheld condemnations for the purposes of slum clearance and land redistribution, respectively. “Subject to specific constitutional limitations,” Berman proclaimed, “when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation.” 348 U. S., at 32. That reasoning was question begging, since the question to be decided was whether the “specific constitutional limitation” of the Public Use Clause prevented the taking of the appellant’s (concededly “nonblighted”) department store. Id., at 31, 34. Berman also appeared to reason that any exercise by Congress of an enumerated power (in this case, its plenary power over the District of Columbia) was per se a “public use” under the Fifth Amendment. Id., at 33. But the very point of the Public Use Clause is to limit that power. See supra, at 508.
More fundamentally, Berman and Midkiff erred by equating the eminent domain power with the police power of States. See Midkiff, supra, at 240 (“The ‘public use’ requirement is ... coterminous with the scope of a sovereign’s police powers”); Berman, supra, at 32. Traditional uses of that regulatory power, such as the power to abate a nuisance, required no compensation whatsoever, see Mugler v. Kansas, 123 U. S. 623, 668-669 (1887), in sharp contrast to the takings power, which has always required compensation, see supra, at 508, and n. 1. The question whether the State can take property using the power of eminent domain is therefore distinct from the question whether it can regulate property pursuant to the police power. See, e. g., Lucas v. South Carolina Coastal Council, 505 U. S. 1003, 1014 (1992); Mugler, *520 supra, at 668-669. In Berman, for example, if the slums at issue were truly “blighted,” then state nuisance law, see, e. g., supra, at 510; Lucas, supra, at 1029, not the power of eminent domain, would provide the appropriate remedy. To construe the Public Use Clause to overlap with the States’ police power conflates these two categories.[3]
The “public purpose” test applied by Berman and Midkiff also cannot be applied in principled manner. “When we depart from the natural import of the term ‘public use,’ and substitute for the simple idea of a public possession and occupation, that of public utility, public interest, common benefit, general advantage or convenience ... we are afloat without any certain principle to guide us.” Bloodgood v. Mohawk & Hudson R. Co., 18 Wend. 9, 60-61 (NY 1837) (opinion of Tracy, Sen.). Once one permits takings for public purposes in addition to public uses, no coherent principle limits what could constitute a valid public use — at least, none beyond Justice O’Connor’s (entirely proper) appeal to the text of the Constitution itself. See ante, at 494,501-505 (dissenting opinion). I share the Court’s skepticism about a public use standard that requires courts to second-guess the policy wisdom of public works projects. Ante, at 486-489. The “public purpose” standard this Court has adopted, however, demands the use of such judgment, for the Court concedes that the Public Use Clause would forbid a purely private taking. *521 Ante, at 477-478. It is difficult to imagine how a court could find that a taking was purely private except by determining that the taking did not, in fact, rationally advance the public interest. Cf. ante, at 502-503 (O’Connor, J., dissenting) (noting the complicated inquiry the Court’s test requires). The Court is therefore wrong to criticize the “actual use” test as “difficult to administer.” Ante, at 479. It is far easier to analyze whether the government owns or the public has a legal right to use the taken property than to ask whether the taking has a “purely private purpose” — unless the Court means to eliminate public use scrutiny of takings entirely. Ante, at 477-478, 488-489. Obliterating a provision of the Constitution, of course, guarantees that it will not be misapplied.
For all these reasons, I would revisit our Public Use Clause cases and consider returning to the original meaning of the Public Use Clause: that the government may take property only if it actually uses or gives the public a legal right to use the property.
IV
The consequences of today’s decision are not difficult to predict, and promise to be harmful. So-called “urban renewal” programs provide some compensation for the properties they take, but no compensation is possible for the subjective value of these lands to the individuals displaced and the indignity inflicted by uprooting them from their homes. Allowing the government to take property solely for public purposes is bad enough, but extending the concept of public purpose to encompass any economically beneficial goal guarantees that these losses will fall disproportionately on poor communities. Those communities are not only systematically less likely to put their lands to the highest and best social use, but are also the least politically powerful. If ever there were justification for intrusive judicial review of constitutional provisions that protect “discrete and insular minorities,” United States v. Carotene Products Co., 304 U. S. *522 144, 152, n. 4 (19B8), surely that principle would apply with great force to the powerless groups and individuals the Public Use Clause protects. The deferential standard this Court has adopted for the Public Use Clause is therefore deeply perverse. It encourages “those citizens with disproportionate influence and power in the political process, including large corporations and development firms,” to victimize the weak. Ante, at 505 (O’Connor, J., dissenting).
Those incentives have made the legacy of this Court’s “public purpose” test an unhappy one. In the 1950’s, no doubt emboldened in part by the expansive understanding of “public use” this Court adopted in Berman, cities “rushed to draw plans” for downtown development. B. Frieden & L. Sagalyn, Downtown, Inc. How America Rebuilds Cities 17 (1989). “Of all the families displaced by urban renewal from 1949 through 1963, 63 percent of those whose race was known were nonwhite, and of these families, 56 percent of nonwhites and 38 percent of whites had incomes low enough to qualify for public housing, which, however, was seldom available to them.” Id., at 28. Public works projects in the 1950’s and 1960’s destroyed predominantly minority communities in St. Paul, Minnesota, and Baltimore, Maryland. Id., at 28-29. In 1981, urban planners in Detroit, Michigan, uprooted the largely “lower-income and elderly” Poletown neighborhood for the benefit of the General Motors Corporation. J. Wylie, Poletown: Community Betrayed 58 (1989). Urban renewal projects have long been associated with the displacement of blacks; “[i]n cities across the country, urban renewal came to be known as ‘Negro removal.’ ” Pritchett, The “Public Menace” of Blight: Urban Renewal and the Private Uses of Eminent Domain, 21 Yale L. & Pol’y Rev. 1, 47 (2003). Over 97 percent of the individuals forcibly removed from their homes by the “slum-clearance” project upheld by this Court in Berman were black. 348 U. S., at 30. Regrettably, the predictable consequence of the Court’s decision will be to exacerbate these effects.
*523 * * *
The Court relies almost exclusively on this Court’s prior cases to derive today’s far-reaching, and dangerous, result. See ante, at 479-483. But the principles this Court should employ to dispose of this case are found in the Public Use Clause itself, not in Justice Peekham’s high opinion of reclamation laws, see supra, at 515-516. When faced with a clash of constitutional principle and a line of unreasoned cases wholly divorced from the text, history, and structure of our founding document, we should not hesitate to resolve the tension in favor of the Constitution’s original meaning. For the reasons I have given, and for the reasons given in Justice O’Connor’s dissent, the conflict of principle raised by this boundless use of the eminent domain power should be resolved in petitioners’ favor. I would reverse the judgment of the Connecticut Supreme Court.

 Some state constitutions at the time of the founding lacked just compensation clauses and took property even without providing compensation. See Lucas v. South Carolina Coastal Council, 505 U. S. 1003, 1056-1057 (1992) (Blackmun, J., dissenting). The Framers of the Fifth Amendment apparently disagreed, for they expressly prohibited uncompensated takings, and the Fifth Amendment was not incorporated against the States until much later. See id., at 1028, n. 15.

 Compare ante, at 479, and n. 8 (majority opinion) (noting that some state courts upheld the validity of applying the Mill Acts to private purposes and arguing that the “ “use by the public’ test” “eroded over time”), with, e. g., Ryerson v. Brown, 35 Mich. 333, 338-339 (1877) (holding it “essential” to the constitutionality of a Mill Act “that the statute should require the use to be public in fact; in other words, that it should contain provisions entitling the public to accommodations”); Gaylord v. Sanitary Dist. of Chicago, 204 Ill. 576, 581-584, 68 N. E. 522, 524 (1903) (same); Tyler v. Beacher, 44 Vt. 648, 652-656 (1871) (same); Sadler v. Langham, 34 Ala. 311, 332-334 (1859) (striking down taking for purely private road and grist mill); Varner v. Martin, 21 W. Va. 534, 546-548, 556-557, 566-567 (1883) (grist mill and private road had to be open to public for them to *514 constitute public use); Harding v. Goodlett, 3 Yer. 41, 53 (Tenn. 1832); Jacobs v. Clearview Water Supply Co., 220 Pa. 388, 393-395, 69 A. 870, 872 (1908) (endorsing actual public use standard); Minnesota Canal & Power Co. v. Koochiching Co., 97 Minn. 429, 449-451, 107 N. W. 405, 413 (1906) (same); Chesapeake Stone Co. v. Moreland, 126 Ky. 656, 663-667, 104 S. W. 762, 765 (Ct. App. 1907) (same); Note, Public Use in Eminent Domain, 21 N. Y. U. L. Q. Rev. 285, 286, and n. 11 (1946) (calling the actual public use standard the “majority view” and citing other cases).

 Some States also promoted the alienability of property by abolishing the feudal “quit rent” system, i. e., long-term leases under which the proprietor reserved to himself the right to perpetual payment of rents from his tenant. See Vance, The Quest for Tenure in the United States, 33 Yale L. J. 248, 256-257, 260-263 (1923). In Hawaii Housing Authority v. Midkiff, 467 U. S. 229 (1984), the Court cited those state policies favoring the alienability of land as evidence that the government’s eminent domain power was similarly expansive, see id., at 241-242, and n. 5. But they were uses of the States’ regulatory power, not the takings power, and therefore were irrelevant to the issue in Midkiff. This mismatch underscores the error of conflating a State’s regulatory power with its takings power.